**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Peter ARVANITIS, Stanley Peters, John Yannakis, Perikles Panagiotaros, and Robert Richards, Defendants–Appellants.**

Nos. 88–2319, 88–2321, 88–2546, 88–2890 and 88–2891.

United States Court of Appeals, Seventh Circuit.

Argued April 11, 1989.

Decided May 3, 1990.

Ted S. Helwig, Matthew R. Bettenhausen, Steve Miller, James R. Ferguson, and David J. Stetler, Asst. U.S. Attys., Office of the United States Attorney, Chicago, Ill., for U.S.

Allan A. Ackerman, Chicago, Ill., for Peter Arvanitis.

Patrick A. Tuite, Tuite, Mejia & Giacchetti, Chicago, Ill., for Stanley Peters.

William H. Theis, Chicago, Ill., for John Yannakis.

Kent R. Carlson, Ronald D. Menaker, Chicago, Ill., for Perikles Panagiotaros.

Kent R. Carlson, Thomas J. Royce, Chicago, Ill., for Robert Richards.

Before BAUER, Chief Judge, and FLAUM and EASTERBROOK, Circuit Judges.

BAUER, Chief Judge.

On July 13, 1987, a United States Grand Jury sitting in the Northern District of Illinois returned a twenty-eight count indictment against eleven defendants for their participation in a worldwide arson and extortion ring. Thereafter, the grand jury returned a superseding indictment on February 1, 1988. The superseding indictment alleged that Peter Arvanitis, Perikles Pana-

giotaros, Robert Richards and Peter Leventopoulos directed the activities of a racketeering enterprise ("the enterprise" or "the RICO enterprise") engaged in the business of performing contract bombings and arson on behalf of individuals who sought to destroy their businesses in order to defraud their insurance companies. The indictment further alleged that the enterprise used threats of violence and actual violence for the purpose of extorting money and property from their victims. Arvanitis, Panagiotaros, and Richards entered guilty pleas to several of the counts with which they were charged.[1] Arvanitis then brought a direct appeal, alleging that his counsel was constitutionally deficient and that the district court abused its discretion in ordering full restitution. We reject his first contention but remand the order of restitution to the district court for recalculation of the amount of loss suffered by the Zurich Insurance Company (Zurich), one of the insurance companies defrauded by the enterprise.

Panagiotaros and Richards did not file a direct appeal. Instead they filed a motion in the district court to vacate their pleas pursuant to 28 U.S.C. § 2255 and, like Arvanitis, claimed that they were denied effective assistance of counsel. The court denied their motion and they appeal. On appeal, they also add that the court improperly ordered them to pay restitution. We affirm the district court's determination with respect to the ineffective assistance issue, but remand for the court to determine whether Panagiotaros and Richards can establish cause for their failure to raise on direct appeal the court's incorrect calculation of Zurich's loss.

The other defendants indicted were allegedly "clients" of the RICO enterprise. They owned the businesses destroyed by arson or bombings and fraudulently submitted insurance claims on those businesses. Two of these defendants have brought appeals to this court. After a bench trial, Stanley Peters (a.k.a. Stelios Panagiotaros), the brother of Perikles Panagiotaros, was

1. Leventopolous entered into a separate plea agreement with the government, which is not a subject of this appeal.

found guilty of procuring the destruction of his business and of the counts related to this charge. On appeal, he claims that the district court committed reversible error by admitting certain hearsay testimony. Although we find that the court incorrectly admitted the contested evidence, the error was harmless and we therefore affirm Peters' conviction.

Like Peters, John Yannakis originally was charged with arranging the destruction of his business through the services of this racketeering enterprise. The government later dropped these charges and filed a superseding information which charged Yannakis with one count of mail fraud. Yannakis pled guilty to this count. On appeal, he contends that the district court erroneously ordered that he pay restitution. We agree and reverse.

This court consolidated the appeals of these five defendants upon its own motion.

## I. Arvanitis, Panagiotaros and Richards

The superseding indictment of February 1, 1988 alleged that Arvanitis, Richards, Panagiotaros and Leventopoulos were the core co-conspirators in an arson and extortion enterprise. Count 1 charged Arvanitis, Richards, Panagiotaros and Leventopoulos with participation in an enterprise which engaged in a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c).[2] Count 2 charged them with conspiracy to engage in the pattern of racketeering activity charged in Count 1 in violation of 18 U.S.C. § 1962(d). The indictment also charged these four defendants with numerous other violations of federal law.[3]

Arvanitis, Panagiotaros and Richards entered into a plea agreement with the government. All three defendants agreed to plead guilty to Count 2 of the superseding indictment, charging them with conspiracy in violation of 18 U.S.C. § 1962(d). In addition, Arvanitis agreed to plead guilty to Count 25 which charged him with extorting money from John Katsamangas and Chris Ralides through threats of violence and

2. Count One alleged that the defendants committed the following racketeering acts to support the pattern requirement of 18 U.S.C. § 1962(c). Arvanitis allegedly committed four predicate acts: the Arrowhead Restaurant arson, the Bonfire Restaurant arson, the extortion of John Katsamangas and Chris Ralides, and the extortion of Franteskos Sdralis.

Richards allegedly committed seven predicate acts: the Bloomingshire Restaurant arson, the George's Fruitmarket arson, the Stanley's Fruitmarket arson, the Bonfire Restaurant arson, the extortion of John Kourelis, the extortion of Katsamangas and Ralidses, and the extortion of Sdralis.

Six predicate acts were alleged against Panagiotaros: the Arrowhead Restaurant arson, the Bloomingshire Restaurant arson, the George's Fruitmarket arson, the Stanley's Fruitmarket arson, and the extortion of Katsamangas and Ralides, and the extortion of Sdralis.

3. In addition to the charges contained in Counts 1 and 2, Arvanitis was charged with one count of mail fraud in violation of 18 U.S.C. §§ 1341 and 1342, one count of conspiracy to commit arson in violation of 18 U.S.C. §§ 371 and 372, one count of the use of a firearm during the commission of a felony in violation of 18 U.S.C. § 924(c)(1), two counts of conspiracy to commit extortion in violation of 18 U.S.C. § 1951, two counts of conspiracy to use extortionate means to collect an extension of credit in violation of

18 U.S.C. § 894, and two counts of the use of a facility in interstate commerce to carry on unlawful activity in violation of 18 U.S.C. § 1952(a).

Richards was charged with six counts of mail fraud in violation of 18 U.S.C. §§ 1341 and 1342, one count of conspiracy to commit arson in violation of 18 U.S.C. §§ 371 and 372, three counts of arson in violation of §§ 844(i) and 2, four counts of the use of a firearm in the commission of a felony in violation of 18 U.S.C. § 924(c), one count of interstate travel in order to carry out illegal activity in violation of 18 U.S.C. § 1952(a), three counts of conspiracy to commit extortion in violation of 18 U.S.C. § 1951, two counts of conspiracy to use extortionate means to collect an extension of credit in violation of 18 U.S.C. § 894, and one count of illegal possession of a firearm in violation of 18 U.S.C. § 1202.

Panagiotaros was charged with seven counts of mail fraud in violation of 18 U.S.C. §§ 1341 and 1342, one count of conspiracy to commit arson in violation of 18 U.S.C. §§ 371 and 372, four counts of arson in violation of 18 U.S.C. §§ 844(i) and 2, four counts of the use of a firearm during the commission of a felony in violation of 18 U.S.C. § 924(c), two counts of conspiracy to commit extortion in violation of 18 U.S.C. § 1951, and two counts of the use of extortionate means to collect an extension of credit in violation of 18 U.S.C. § 894.

actual use of violence in violation of 18 U.S.C. § 1951. Richards and Panagiotaros each agreed to plead guilty to Count 7 of the indictment which alleged that Panagiotaros set fire to the Arrowhead Restaurant and that he and Richards caused a false claim for insurance to be delivered to the insurer in violation of 18 U.S.C. § 1341. The agreement further provided:

> The government, at the time of sentencing, will recommend substantial incarceration against each of the defendants. The United States will bring all matters in aggravation and mitigation to the sentencing court. [The government] will move to dismiss the remaining counts of the indictment at the time of sentencing. As is [the government's] duty under the [Victim Witness and Protection Act, 18 U.S.C. §§ 3663, 3664], [the government] will call to the Court's attention the identity of all victims and their monetary losses and whatever restitution is required to make them whole. [The government] will call that to the attention of the sentencing court.

The defendants thereafter pled guilty to the charges specified in the agreement.

The court then ordered the preparation of pre-sentence investigation (PSI) reports. The original PSI reports estimated that under Parole Commission guidelines, each defendant would receive a category five offense severity rating. Prior to the sentencing hearing, the probation department submitted a supplemental report, raising its estimate of the applicable offense severity rating to a category six. The defendants filed objections to the PSI reports, including an objection to the increase in the estimate of the offense severity rating. The court ordered the government to respond to the defendants' objections prior to the sentencing hearing.

At the sentencing hearing, the defendants again objected to the probation department's supplemental report and also to the government's response to the report. The defendants alleged that the severity rating of five induced their pleas. The court, however, found that the offense severity rating was not part of the defendant's plea agreements with the government. The court then asked whether the defendants wished to withdraw their guilty pleas. After a brief recess, in which defense counsel consulted with their clients, the attorneys returned, stating that the defendants would be satisfied if the court sentenced them on the basis that they would receive an offense severity rating of five.

The district court then sentenced Arvanitis to serve twelve years in the custody of the Attorney General on Count 2, to be followed by five years probation on Count 25. It sentenced Richards to serve fifteen years on Count 2, to be followed by five years probation on Count 7, and it sentenced Panagiotaros to serve nine years on Count 2, to be followed by five years probation on Count 7. The court also ordered Arvanitis, Panagiotaros and Richards to pay restitution to various insurance companies for four of the arsons in which they were involved. The court found that these three defendants caused losses of $315,783.87, and it imposed joint and several liability upon them pursuant to the Victim and Witness Protection Act of 1982 ("VWPA"), 18 U.S.C. §§ 3579, 3580 (recodified at 18 U.S.C. §§ 3663, 3664, effective November 1, 1986).

After the defendants had been sentenced and tendered to the custody of the Attorney General, the Parole Commission concluded that the offense severity ratings for Arvanitis, Panagiotaros and Richards should be a category seven. Arvanitis then filed a direct appeal. On appeal, he alleges that his counsel's performance was constitutionally deficient because his counsel erroneously advised him that he would receive an offense severity rating of five. He also alleges that the district court abused its discretion in ordering him to make full restitution.

Panagiotaros and Richards filed a motion to withdraw their guilty pleas, and like Arvanitis, claimed they were denied effective assistance of counsel. This motion, however, was filed after sentencing, and the avenues to attack the guilty pleas therefore were limited to a direct appeal or

a motion under 28 U.S.C. § 2255. Fed.R. Crim.P. 32(d). Rather than filing a direct appeal, Panagiotaros and Richards asked the court to treat their motion as one brought pursuant to 28 U.S.C. § 2255. The district court thereafter issued an opinion, rejecting their ineffective assistance of counsel claim and denying their petition for relief. 694 F.Supp. 510. Panagiotaros and Richards then filed a notice of appeal. In addition to their ineffective assistance claim, these two defendants also contend on appeal that the district court abused its discretion in ordering full restitution.

## A. Arvanitis' Direct Appeal

### 1. *Ineffective Assistance of Counsel*

▬ Arvanitis claims that his attorney's incorrect estimate of the applicable offense severity rating amounts to ineffective assistance of counsel. In order to prevail upon this claim, Arvanitis must demonstrate that his attorney's representation fell below an objective standard of reasonableness, and that there is a reasonable probability that but for his attorney's unprofessional errors, the results of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–88, 104 S.Ct. 2052, 2064–65, 80 L.Ed.2d 674 (1984). This two prong analysis applies to guilty plea challenges based upon ineffective assistance of counsel claims. *Hill v. Lockhart*, 474 U.S. 52, 57–58, 106 S.Ct. 366, 369–370, 88 L.Ed.2d 203 (1985).

Arvanitis cannot satisfy either prong of the *Strickland* analysis. First, a "mere inaccurate prediction, standing alone, [does] not constitute ineffective assistance." *Iaea v. Sunn*, 800 F.2d 861, 865 (9th Cir.1986). As the Supreme Court held in *McMann v. Richardson*, 397 U.S. 759, 770, 90 S.Ct. 1441, 1448, 25 L.Ed.2d 763 (1970):

[A] decision to plead guilty must necessarily rest upon counsel's answers, uncertain as they may be. Waiving trial entails the inherent risk that the good faith evaluations of a reasonably competent attorney will turn out to be mistaken either as to the facts or as to what a court's judgment might be on given facts.

Because Arvanitis alleges nothing more, his counsel's "mere inaccurate prediction" does not amount to ineffective assistance. *United States v. Turner*, 881 F.2d 684 (9th Cir.1989) (rejecting claim of ineffective assistance based solely on allegation that counsel erroneously estimated the defendant's possible sentencing range under the Sentencing Guidelines); *United States v. Sweeney*, 878 F.2d 68 (2nd Cir.1989) (same), *Hill v. Lockhart*, 894 F.2d 1009, 1010–11 (8th Cir.1990) (Bowman, J., dissenting).[4] *Cf. Sparks v. Sowders*, 852 F.2d 882, 885 (6th Cir.1988) (gross misadvice concerning parole eligibility can amount to ineffective assistance); *Iaea*, 800 F.2d at 864–65 (same).

▬ Second, Arvanitis cannot demonstrate that he was prejudiced by his counsel's alleged error. To establish prejudice in the guilty plea context, a defendant must show that "counsel's constitutionally defective performance affected the outcome of the plea process. In other words, ... the defendant must show that there is a reasonable probability that, but for counsel's errors, [the defendant] would not have pleaded guilty *and would have insisted on going to trial.*" *Hill*, 474 U.S. at 59, 106 S.Ct. at 370 (emphasis added). A mere allegation by the defendant that he would have insisted on going to trial is insufficient to establish prejudice. *United States v. Key*, 806 F.2d 133, 139 (7th Cir.1986). Arvanitis, however, does not even make *this* allegation; instead, he asks for the

---

**4.** The majority opinion in *Hill* conflicts with both *Sweeney* and *Turner* and is not well reasoned. In *Hill*, the defendant's attorney allegedly informed him that he would be eligible for parole in 6 years when, in fact, he would not have been eligible in less than 8 years and 9 months. Even though trial would have exposed the defendant to a possible sentence of 5 to 50 years or life imprisonment without parole, the majority found that counsel's alleged misadvice was constitutionally deficient. We agree with the *Hill* minority that "[the majority's] holding foregoes objective analysis of [the defendant's] options at the time of his plea bargaining in favor of slippery subjectivity," *Hill*, 894 F.2d at 1010, and will lead to a flood of meritless habeas petitions. We therefore join in the minority's criticism of the *Hill* opinion.

opportunity to plead anew, *see* Arvanitis Brief at 28, and so has failed to establish prejudice. *See United States v. Gargano*, 852 F.2d 886, 891 (7th Cir.1988) (Petitioner's statement that had he been better advised, he would not have accepted the sentence or entered into *that* agreement is insufficient to establish prejudice.).

 Moreover, when given the opportunity to withdraw his guilty plea because of the higher-than-expected severity rating, Arvanitis demurred. At the sentencing hearing, the district court asked Arvanitis, as well as Panagiotaros and Richards, if they wished to withdraw their guilty pleas in response to the category six rating and proceed to trial. Counsel for Arvanitis instead suggested that the district court sentence the defendants as if they would receive a category five rating. In response, the district court informed the defendants that it could not "bind a Parole Board from making its own categorization somewhere down the line." Transcript of Sentencing Proceedings ("Sent. Tr.") at 17. The court later stated, "I simply do not know at this stage whether I as a district court judge have the authority to tell the parole authorities what independent decision they must make. I can only say what decision I make and what decision I think they ought to make." *Id.* at 29. Despite the court's caveat, none of the defendants withdrew their pleas. Instead, they requested that the court sentence them as if they would receive a category five rating.[5] Having foregone the opportunity to withdraw his plea with the knowledge that his attorney's prediction was wrong, Arvanitis cannot now claim prejudice. *Worthen v. Meachum*, 842 F.2d 1179 (10th Cir.1988). *See also United States v. Billington*, 844 F.2d 445, 450 (7th Cir.1988).

## 2. *Restitution*

Arvanitis contends that the district court erred because it did not assign reasons for ordering full restitution. He also contends that the district court abused its discretion by failing to consider certain mandatory, and in his view, mitigating, factors. We reject both arguments, but find that the order must be remanded to the district court to recalculate the amount of loss suffered by one of the insurance companies defrauded by the enterprise.

 Arvanitis' first challenge is procedural.[6] Under the VWPA, a district court

---

5. Arvanitis also claims that he was denied his due process right to be sentenced on the basis of accurate information because the court sentenced him as if he would receive a category five offense severity rating, making him eligible for parole within 24–36 months of incarceration, when in fact, he received a category seven, making him eligible for parole within 54–92 months. *See United States v. Tucker*, 404 U.S. 443, 447, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972). The district court's mistaken belief, however, about a defendant's "approximate release dates and [its] consideration of these dates in handing down the sentence[ ] . . . is not 'misinformation of a constitutional magnitude' as described in *Tucker.*" *United States v. Plain*, 856 F.2d 913, 916 (7th Cir.1988). *See also United States v. Katzin*, 824 F.2d 234 (3rd Cir.1987); *United States v. Dean*, 752 F.2d 535 (11th Cir. 1985). Furthermore, Arvanitis is estopped from complaining about being sentenced on the basis of a category five, when the district court did so at his behest.

6. There is a second potential procedural problem with the order of restitution based upon *United States v. Peden*, 872 F.2d 1303 (7th Cir. 1989), a case from this circuit decided after oral argument. In dictum, *Peden* stated that "unless the defendant stipulates to the amount of restitution proffered and his ability to pay, the district judge must conduct a hearing to consider the propriety of the amount of restitution, in addition to determining the defendant's obligations, debts, and ability to pay." *Id.* at 1311. In the present case, Arvanitis did not stipulate to the amount of restitution, nor did the court hold a formal hearing on the matter. The *Peden* court's use of the word "must" may be misleading, however. If a defendant wants to challenge the amount of restitution, his ability to pay, or the accuracy of the financial information provided to the court, then he must be given an opportunity to do so. *See United States v. Cloud*, 872 F.2d 846, 855 (9th Cir.1989). How that is best handled is left to the discretion of the district court. *Id.* at 855 n. 11; *United States v. Keith*, 754 F.2d 1388, 1393 (9th Cir.1989). *Peden* should not be read as a means to transform the sentencing hearing into a second trial on the issue of restitution, contrary to congressional intent. *See* 18 U.S.C. § 3663(d) ("The court shall impose an order of restitution to the extent that such order is as fair as possible to the victim and *the imposition of such order will not unduly complicate or prolong the sentencing*

may order restitution only after considering the following factors: (1) the amount of loss sustained by any victim as a result of the offense, (2) the financial resources of the defendant, (3) the financial needs of the defendant and the defendant's dependents, (4) the financial earning ability of the defendant and the defendant's dependents and (5) such other factors as the court deems appropriate. 18 U.S.C. § 3664(a). Arvanitis contends that because consideration of these factors is mandatory, the district court should have made findings of fact on the record about them.

Although the VWPA does require the district court to make findings on the record, the requirement is applicable only when the court refuses to order full restitution. *See* 18 U.S.C. § 3663(a)(2). *United States v. Mahoney*, 859 F.2d 47, 49–50 (7th Cir.1988); *United States v. Gomer*, 764 F.2d 1221, 1223 (7th Cir.1985). *See also United States v. Patterson*, 837 F.2d 182, 183 (5th Cir.1988); *United States v. Purther*, 823 F.2d 965, 969 (6th Cir.1987); *United States v. Atkinson*, 788 F.2d 900, 902 (2nd Cir.1986). *But see United States v. Bruchey*, 810 F.2d 456, 458 (4th Cir.1987); *United States v. Hill*, 798 F.2d 402, 406–07 (10th Cir.1986); *United States v. Palma*, 760 F.2d 475, 480 (3rd Cir.1986). Here, the court ordered full restitution and thus was not required to make explicit findings of fact regarding the statutory factors.

■ Arvanitis next challenges the merits of the district court's restitution order. As he is attacking the court's decision to order restitution and the amount of restitution ordered, Arvanitis must establish that in making these determinations the court abused its discretion. *United States v. Studley*, 892 F.2d 518, 531 (7th Cir.1989). Despite this deferential standard of review, we have held that the district court must consider the factors listed in § 3664(a) in making its decision. *United States v. Gomer*, 764 F.2d 1221, 1223. Thus the record must reflect that the court had in-

formation about the defendants' and their dependents' financial resources and needs at its disposal. *United States v. Patterson*, 837 F.2d at 183; *United States v. Ruffen*, 780 F.2d 1493, 1495 (9th Cir.1986).

■ Pursuant to Fed.R.Crim.P. 32(c)(2)(A) and 18 U.S.C. § 3664(b), the court ordered the preparation of pre-sentence investigation reports containing financial information about the defendants and their dependents. Included in the report on Arvanitis was a statement of net worth, total income, total expenses and net monthly cash flow. It covered Arvanitis' work history and employment skills. In addition, the report listed the members of his family and their employment status, noting which members were dependent upon his financial support. It is thus apparent that the court had sufficient information before it to comply with its obligation to consider the mandatory factors prior to ordering restitution.

Once we have determined that the court possessed the necessary information, the next inquiry is whether the district court improperly rejected the potentially mitigating effect of the defendant's or his dependents' financial situation. The statute contemplates the imposition of full restitution whenever possible, *see* 18 U.S.C. § 3663(a)(2); *see also United States v. McClellan*, 868 F.2d 210, 212 (7th Cir.1989) (amount of restitution ordered is appropriate when it represents actual proceeds of the crime), and the burden falls upon the defendant to demonstrate that because of his particular circumstances, full restitution is unwarranted. *See* 18 U.S.C. § 3664(d) ("Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence.... The burden of demonstrating the financial resources of the defendant and the financial needs of the defendant and such defendant's dependents shall be on the defendant."). Although a

---

process.") (emphasis added). *See also Cloud*, 872 F.2d at 855 n. 11. In this case, Arvanitis had ample opportunity to challenge the proposed amount of restitution and to submit his version of the mandatory factors. He could

have raised the issue in his objections to the PSI and at the sentencing hearing, where the court twice raised the issue of restitution. Arvanitis' failure to take advantage of these opportunities lies not with the district court, but with himself.

defendant usually cannot meet this burden by demonstrating indigency, *see, e.g., United States v. Fountain,* 768 F.2d 790, 803 (7th Cir.1985); *United States v. Ruffen,* 780 F.2d at 1495; *United States v. Atkinson,* 788 F.2d at 904, we have found that the needs of the defendant's dependents may require a reversal of an order of full restitution. *See, e.g., United States v. Mahoney,* 859 F.2d at 50–51; *United States v. Gomer,* 764 F.2d at 1223–24.

In the court below, Arvanitis failed to convince the judge that his financial condition or any other mitigating factors warranted less than full restitution. In this court, he has similarly failed to convince us that the judge abused his discretion by ordering full restitution. Arvanitis has never challenged the accuracy or completeness of the financial information included in the PSI report, nor has he argued that other circumstances justified a reduction in the amount of restitution sought by the government. On the record before this court, we find that the order of restitution was not an abuse of discretion.

 Although the district court did not abuse its discretion with respect to the issues raised by Arvanitis, we find that the court committed plain error in calculating the loss suffered by one of the insurance companies defrauded by the enterprise. The court ordered Arvanitis, along with Panagiotaros, Richards and John Yannakis, to make restitution to the Zurich Insurance Company in the amount of $70,573.87. Of that amount, $40,573.87 represented the amount which Zurich expended in legal fees in investigating the claim for insurance on the Arrowhead Restaurant. However, legal fees generated in prosecuting a claim are not recoverable under the VWPA. In the case of restitution for offenses resulting in the loss of property, 18 U.S.C. § 3663(b) limits recovery to property which is the subject of the offense, thereby making restitution for consequential damages, such as attorneys fees, unavailable. *See United States v. Barany,* 884 F.2d 1255 (9th Cir.1989); *United States v. Mitchell,* 876 F.2d 1178 (5th Cir.1989). We therefore remand the restitution order to the district court with directions for it to reduce the amount of restitution owed by Arvanitis by $40,573.87.

**B. Panagiotaros' and Richards' § 2255 Motion**

 Instead of filing a direct appeal like Arvanitis, Panagiotaros and Richards filed a § 2255 motion in the district court, raising only the ineffective assistance of counsel claim. In so doing, they now must demonstrate cause and prejudice for their failure to raise their claims on direct appeal. *United States v. Bontkowski,* 850 F.2d 306, 313 (7th Cir.1988). Furthermore, because they failed to raise their restitution claims in their § 2255 motion before the district court, they also must demonstrate that the alleged errors in the restitution order amounted to plain error. Even if Panagiotaros and Richards could make the necessary showings, their efforts would be to no avail. Their claims mirror Arvanitis' and, as previously discussed, there is no merit to Arvanitis' claims. We found, however, that the court's incorrect calculation of Zurich's loss amounted to plain error. We therefore remand to the district court for it to determine whether Panagiotaros and Richards can demonstrate cause for their failure to raise the amount of Zurich's loss on direct appeal.

*II. Yannakis*

Yannakis and his business partner, Anastasios Paschalis, were co-owners of the Arrowhead Restaurant, one of the buildings destroyed by the enterprise. The original indictment alleged that Yannakis and Paschalis conspired with the enterprise to destroy the restaurant and then submitted fraudulent insurance claims to the Zurich Insurance Company. A superseding information, however, reduced the charges against Yannakis to a single count of mail fraud in violation of 18 U.S.C. § 1341, based upon the allegation that Yannakis lied under oath about the value of the Arrowhead Restaurant. Yannakis pled guilty to this count and the district court sentenced him to serve five years probation, the first six months of which were to

be spent in the custody of the Attorney General. Along with Arvanitis, Panagiotaros and Richards, Yannakis also was ordered to make restitution to Zurich in the amount of $70,573.87. Yannakis appeals only the restitution order. First, he claims that legal fees are not recoverable under the VWPA. As discussed previously, *supra* section I.A.2., we agree. Second, he claims he did not cause the loss sustained by Zurich when it settled the claim on the Arrowhead Restaurant. We also agree with this contention and therefore reverse the entire order of restitution as it applies to him.

During the investigation into the claim on the Arrowhead Restaurant, Zurich's attorney deposed Yannakis. Under oath, Yannakis stated that the owner of the building where the Arrowhead was located had offered to buy the restaurant for $120,000. Zurich's attorney, however, did not accept at face value Yannakis' statement and so deposed the building manager, who stated that the owner of the building never made an offer to buy the Arrowhead Restaurant. The attorney also examined Yannakis' personal and business financial records which revealed that the business was not worth $120,000. Knowing that Yannakis had lied about the restaurant's value and aware of the suspicious circumstances surrounding the destruction of the restaurant, Zurich decided to settle the claim anyway, but only for $30,000.

Before restitution can be ordered, the government must show that the offense caused the loss sustained by the victim. *United States v. Kuna,* 760 F.2d 813, 820 (7th Cir.1989). Thus the district court had to find that Yannakis' false statement caused loss to Zurich. Yannakis claims that the arson, not the false statement, caused the loss sustained by Zurich. We agree, of course, that but for the arson, there was no basis for a claim under the policy. This does not necessarily mean that Yannakis' false statement also could not have caused the loss to Zurich by influ-

encing its decision to settle the policy. Indeed, Yannakis admittedly invented the offer in order to make the restaurant appear financially successful and improve the probability that Zurich would settle. Nevertheless, Zurich discovered Yannakis' fiction prior to settling the claim and Yannakis' invention therefore could not have influenced its decision to settle. Because Yannakis' offense did not cause the loss suffered by Zurich, we reverse the district court's order of restitution.

### III. Peters

Stanley Peters owned Stanley's Fruitmarket, one of the buildings destroyed by the RICO enterprise. The superseding indictment alleged that Peters hired the enterprise in order to collect $174,000 in insurance proceeds from the Illinois Emcasco Insurance Company (Emcasco). For his participation in the scheme, he was charged with one count of conspiracy to commit arson in violation of 18 U.S.C. §§ 371 and 372, one count of arson in violation of 18 U.S.C. §§ 844(i) and 2, one count of use of a destructive device in violation of 18 U.S.C. § 924(c), and two counts of mail fraud in violation of 18 U.S.C. § 1341. After a bench trial, the district court found Peters guilty of all counts. It sentenced him to three years in the custody of the Attorney General on the § 924(c) violation, to be followed by five years probation on the remaining counts. Peters filed a timely appeal claiming that the district court committed reversible error in admitting certain hearsay evidence. Although we agree that the court erred by admitting the evidence in question, we find that the error was harmless and therefore affirm the conviction.

### A.

At trial, the government contended that Peters hired the arson enterprise to destroy his building in order to collect $174,000 in insurance proceeds.[7] The government alleged that in order to pay for the

---

**7.** Because Stanley's Fruitmarket was not completely destroyed by the arson, Peters did not collect the full value of the policy.

enterprise's services, Peters evicted his current tenant, Louis Kyriazopoulos, who operated a produce business located on the premises of his building, and "sold" the business to Leventopoulos. He then helped Leventopoulos obtain insurance coverage for the contents of the building and for business interruption. This scheme enabled Peters to retain the full amount paid out under his insurance policy by shifting the enterprise's fee for the arson to the insurer providing content and interruption coverage.

In support of its theory, the government presented the following evidence at trial. In June of 1984, Peters told his tenant of five years, Kyriazopoulos, that he had to vacate the premises of Stanley's Fruitmarket within three days. On the evening of June 15, Peters changed the locks on Stanley's Fruitmarket. When Kyriazopoulos arrived at work on June 16, Leventopoulos and Peters' brother, Perry Panagiotaros, were waiting for him. Leventopoulos told Kyriazopoulos that he was the new owner and ordered him to get out. Peters later arrived to assist in the eviction of Kyriazopoulos. Peters threatened Kyriazopoulos with a pipe and told him, "I can do anything I want with this place and I can burn the motherfucker down if I want." As Kyriazopoulos was leaving, Leventopoulos approached him and said not to blame him because he was "going to be here only for a few days."

At trial, Peters testified that he evicted Kyriazopoulos because they operated Stanley's Fruitmarket as a partnership and he was dissatisfied with the partnership. Kyriazopoulos, however, testified that he was merely the building's tenant and his testimony was corroborated by other evidence. Peters' attorney testified that Peters never told him about a partnership agreement, even though he represented Peters in the litigation in the Circuit Court of Cook County. Furthermore, the accountant who worked for both Peters and Kyriazopoulos and filed the corporate tax re-

turns for the business testified that he was never told about a partnership agreement.

Peters also testified that he sold the business to Leventopoulos and contended that the sale was a legitimate business transaction. At trial, Peters produced two cash receipts, one for $5,000 and one for $2,000, which supposedly reflected the cash received from Leventopoulos for a downpayment and for the first month's rent. During a deposition conducted by Emcasco, however, Peters earlier admitted that he never received any money from Leventopoulos. Peters also produced a document which purported to lease the premises to Leventopoulos. The lease gave Leventopoulos the right to occupy the premises on June 1; Kyriazopoulos, however, was still the building's tenant as of June 15.

After evicting Kyriazopoulos, Peters enlisted his personal insurance agent, Constantinos Danos, in his attempt to assist Leventopoulos obtain insurance. Peters called Danos and told him that he had sold his business and that he wanted Danos to insure the new owner, Peter Leventopoulos.[8] A few days later, Peters called Perry Danos, Constantinos' brother and business partner, wanting to know the status of the insurance for Leventopoulos. When Perry said that they needed more information about Leventopoulos, Peters told him to put his name on the application instead. The next day, Leventopoulos obtained insurance, retroactive to June 20, 1984.

In the meantime, Kyriazopoulos had filed suit against Peters in the Circuit Court of Cook County. He sought an injunction so that he could return to operate his business. On June 27, the court ruled against Kyriazopoulos, giving Peters possession of the property. On June 28, Stanley's Fruitmarket was firebombed.

The other evidence presented by the government was the testimony of Agent Hart of the Treasury Department's Bureau of Alcohol, Tobacco and Firearms. This testimony is the subject of Peters' appeal. In 1986, two years after the fire at Stanley's Fruitmarket, Hart met with Levento-

---

**8.** Although Kyriazopoulos estimated that he had approximately $5,000 in inventory when he was evicted, Leventopolous requested content insurance in the amount of $30,000.

poulos under the pretext that he owned a building he wished to destroy. In the course of the conversation, Leventopoulos told Hart that he could not make an arson look like an accident: "[t]here's no such thing and don't ever let anybody kid you." According to Leventopoulos, what you need to do is call an arson an arson but find someone else to blame for it. Leventopoulos then told Hart to check out one of his earlier jobs, Stanley's Fruitmarket. He told Hart that he "threw a guy out of there. You know what I mean? ... The guy had a reason to come back and ... do it."

The district court admitted this conversation on the basis that the statements of Leventopoulos were the statements of a co-conspirator and therefore admissible under Fed.R.Evid. 801(d)(2)(E). On appeal, Peters claims that because the government failed to show his participation in the ongoing conspiracy, the admission of this testimony was reversible error.

### B.

■■■■ Federal Rule of Evidence 801(d)(2)(E) provides that statements made "by a co-conspirator of a party during the course and in furtherance of the conspiracy" are not hearsay and are admissible in evidence. In order to admit evidence under this rule, the district court must find by a preponderance of the evidence that: (1) the declarant and the defendant were members of a conspiracy; (2) the conspiracy existed at the time the statement was made; and (3) the statement was made in furtherance of the conspiracy. *United States v. D'Antoni*, 874 F.2d 1214, 1217 (7th Cir.1989) (*citing United States v. Santiago*, 582 F.2d 1128, 1134 (7th Cir.1978)) (other citations omitted). In determining whether a conspiracy exists, the district court may consider both the independent evidence (that is, evidence other than the proffered hearsay evidence) and the co-conspirator statements. *Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). The district court's findings with respect to these elements are reviewed under the clearly erroneous standard. *Unit-*

*ed States v. Hooks*, 848 F.2d 785, 794 (7th Cir.1988).

■■■■ Peters concedes that Leventopoulos' statement to Agent Hart, made two years after Stanley's Fruitmarket was destroyed, was in furtherance of the ongoing RICO conspiracy to destroy property through arson and bombings. Peters contends, however, that the government failed to establish his participation in this ongoing RICO conspiracy: at best, the evidence established that he was a purchaser of the conspiracy's services. Peters argues that proof of a mere buyer-seller relationship, without more, is insufficient to establish his participation in the conspiracy. *United States v. Douglas*, 874 F.2d 1145, 1151 (7th Cir.1989). We agree.

In order to show Peters' membership in the conspiracy, the government had to establish that Peters not only solicited the services of the conspiracy, but also that he "intended to join and associate himself with its criminal design and purpose." *United States v. Moya–Gomez*, 860 F.2d 706, 758 (7th Cir.1988). The government contends that

> the expertise possessed by the core conspirators (Arvanitis, Panagiotaros, Leventopoulos and Richards) should have put Peters on notice that he was joining forces with a professional arson organization to commit the common venture of arson. The evidence showed that with respect to the Stanley's Fruit[m]arket arson at least three members of the 'core' group were involved. This certainly permits the inference that an organizational structure to the core group was revealed to the non-core defendant such as Peters.

Government Brief at 48. This is the sum of the government's argument. Not surprisingly, we find that this does not demonstrate Peters' participation in the ongoing conspiracy.

■■■■ The improper admission of Leventopoulos' statement, however, does not constitute reversible error. Nonconstitutional error, like this evidentiary error, is governed by the harmless error standard of Rule 52(a) of the Federal Rules of Criminal Procedure. "Any error, defect, irregu-

larity or variance which does not affect substantial rights shall be disregarded." Fed.R.Crim.P. 52(a); *Harris v. Davis,* 874 F.2d 461, 465 (7th Cir.1989) (non-constitutional error "will be deemed to be harmless unless [it] had a 'substantial and injurious effect or influence on the ... verdict' ") (*quoting Kotteakos v. United States,* 328 U.S. 750, 760, 66 S.Ct. 1239, 1245, 90 L.Ed. 1557 (1946)). After reviewing the entire record, we are persuaded that the evidence did not substantially affect the district court's decision.

The government's case against Peters was well supported by persuasive circumstantial evidence. Peters stipulated that Arvanitis, Richards, Leventopoulos, and his brother, Perikles Panagiotaros, operated a racketeering enterprise which performed arsons throughout the Chicago area. He also stipulated that Richards built the bombs which destroyed Stanley's Fruitmarket. The government also established that Peters' alleged reason for evicting Kyriazopoulos was a pretext and the sale of the business to Leventopoulos was a sham. Peters went out of his way to help Leventopoulos obtain insurance. Less than a week after Leventopoulos' insurance became effective, the Fruitmarket was destroyed by a bomb built by one of Leventopoulos' co-conspirators.

Peters, however, contends that Leventopoulos' statement cannot be harmless error because, without it, there would have been no basis for the court to discount his theory of defense. At trial, Peters argued that Kyriazopoulos committed the arson in revenge for his eviction. Peters' theory is predicated upon two equally fantastic assumptions: one, that Kyriazopoulos would attempt to enlist the members of the enterprise (one of whom happened to be Peters' brother and two of whom had forcibly ejected him from the Fruitmarket just a few days previously) in order to gain revenge; and two, that the members of the enterprise, in a sudden and radical change of heart, would agree. With or without Leventopoulos' statement in evidence, Peters theory is, under any circumstance, unbelievable.

Because we find that the statements of Leventopoulos did not have a substantial effect upon the court's finding of guilt, Peters' conviction is affirmed.

*IV. Conclusion*

For the foregoing reasons, we take the following action with respect to these consolidated appeals. Arvanitis' guilty plea is affirmed, but the order of restitution is remanded for recalculation. The court's order denying Panagiotaros' and Richards' § 2255 motion is remanded for consideration of whether sufficient cause exists for their failure to raise the amount of Zurich's loss on direct appeal. Yannakis' order of restitution is reversed. Peters' conviction is affirmed.