UNITED STATES of America,
Plaintiff–Appellee,

v.

Phillip COLEMAN,
Defendant–Appellant.

No. 89–3637.

United States Court of Appeals,
Seventh Circuit.

Argued June 13, 1990.

Decided April 17, 1991.

Colleen D. Coughlin, Barry R. Elden, Asst. U.S. Attys., Crim. Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

John M. Cutrone, Chicago, Ill., Phillip Coleman, Maywood, Ill., for defendant-appellant.

Before CUMMINGS, COFFEY, and RIPPLE, Circuit Judges.

COFFEY, Circuit Judge.

Phillip Coleman, an employee at the Glen Ellyn, Illinois post office, was convicted by a jury of assaulting two postal inspectors, in violation of 18 U.S.C. § 111, and sentenced to a five-month term of imprisonment. On appeal Coleman challenges two of the district court's evidentiary rulings. Because Coleman failed to establish an abuse of discretion, we affirm.

On March 31, 1988, Clyde Headley, a postal supervisor, called Coleman into his office and handed him an employment termination letter from the Postal Service. Peter Donnelly and Terry Wilson, two postal inspectors, were present when Coleman received the letter. Headley had requested their presence for the purpose of providing

security during the discharge of a postal employee.

When Coleman received the letter, he became upset and started to cry. He said to the three men, "Why are you doing this to me? I have a wife and children. My wife just had a baby. You can't fire me." One of the postal inspectors told Coleman to sign the letter indicating its receipt and to leave the post office. Coleman refused to sign the letter until he spoke with his union representative, Larry Haga. The inspectors advised Coleman that he would not need Haga because he was not being questioned.

At this point Coleman testified that he started to walk toward the bathroom because he did not want the postal inspectors to see him crying. The inspectors, on the other hand, testified that Coleman began pacing up and down in the office and flailing his arms. At this point physical contact between Coleman and the inspectors was initiated. The government's version was that Wilson placed his hand on Coleman's shoulder to urge him to sit down and calm himself. Coleman's version was that the inspectors repeatedly pushed him back down into his chair.

Coleman continued to call for Haga. Donnelly finally told Headley to get Haga, and Headley left the office. According to the government, Wilson again placed his hand on Coleman's shoulder in an effort to get him to sit down and calm down. Coleman started swinging his fists and knocked Wilson's hand off his shoulder. The inspectors then stood on either side of Coleman, each taking one of his arms, and tried to get him to sit down. In response Coleman kicked Donnelly in the shin and "mule-kicked" the chair. That action knocked Coleman off balance, and all three men ended up on the floor. According to Coleman, he did not swing at the postal inspectors nor try to punch them. Coleman claimed that he was restrained in the chair, and that on his last attempt to get up, the inspectors pushed him down so hard that the chair fell out from under him and he lost his balance.

Once Coleman was on the floor Donnelly informed him that he was under arrest for assaulting a federal officer and attempted to handcuff him. Wilson aided Donnelly in restraining Coleman by applying pressure to Coleman's neck with his forearms. Coleman claimed that Donnelly repeatedly tried to slap on the handcuffs by hitting him across the wrists. The inspectors finally handcuffed Coleman and returned him to the chair. They summoned the Glen Ellyn Police Department for assistance, and three officers arrived.

Coleman testified that he passed out during the struggle. He only remembered waking up handcuffed and seated in the chair. At this time his stomach began to hurt. Coleman had been hospitalized for stomach problems in the past. The problems arose when he was nervous and when there was too much physical pressure on his stomach. Coleman asked someone to get his stomach medication from his car, and an inspector complied. Coleman also asked for an ambulance, but when one arrived, he refused medical treatment from the paramedics, told them he did not want to go to the hospital, and made no further complaints about stomach problems.

When the paramedics left, the inspectors and the police officers took Coleman from the office. In so doing, they moved his hands from behind his back and placed handcuffs on his hands in front of him. This way Coleman was able to cover them with a jacket as they left the building. Once outside the inspectors placed Coleman in the back seat of their car. Donnelly sat in the back with Coleman while Wilson drove.

As Wilson pulled out of the post office parking lot Coleman apologized to the inspectors and asked them to let him go. When Donnelly told Coleman that it was too late—he was already under arrest, Coleman became verbally abusive. He swore at Donnelly and Wilson and referred to his service record in the Marines. The inspectors claimed that Coleman said, "I killed in Vietnam. I can kill again. I'll kill you and yours." Coleman conceded that he told the inspectors that he served his coun-

try, but insisted that he did so in order to get better treatment from them.

In the car Donnelly took out his *Miranda* card and attempted to read the rights to Coleman. Instead of listening Coleman told Donnelly to "shut the fuck up" and began to bang his head against the inside wall of the car and to kick the back of the front seat. Coleman testified that he loosened his seat belt in order to relieve some of the pressure on his stomach. Donnelly observed him loosening his seat belt, said, "What are you trying to do, escape?", and pushed him against the door, causing him to bang his head against the window.

Donnelly asked Wilson to stop the car because he wanted to handcuff Coleman behind his back. Wilson stopped the car, and the inspectors flagged down a Lombard, Illinois police patrol officer for assistance. With this officer's help, the inspectors recuffed Coleman with his hands behind his back, and tried to get him back into the car. But Coleman held his body rigid and would not budge. After several tries Coleman stopped resisting. He allowed the inspectors to place him in the car with the seat belt secured across his stomach.

Back on the road Coleman again complained of stomach pains and said he thought he might vomit. He began moving around and managed to get his pant belt undone and to get out of his seat belt. He also tried to pull his pants down. Donnelly testified that Coleman said, "If you're going to treat me like an animal, I'm going to act like an animal. I'm going to shit in your car." Coleman testified that he pulled down his pants to relieve the pressure on his stomach, and that he told the inspectors he needed to use the bathroom and did not "want to use the bathroom in the car." In any event, Coleman made such a commotion that Wilson was unable to radio for assistance from the car. He had to stop the car at a restaurant and have Donnelly use a public phone.

While Donnelly was in the restaurant, Coleman bent forward over the back of the front seat. Coleman said he did this because he felt sick to his stomach. Wilson tried to push Coleman back into the seat by grabbing him by the throat and applying pressure in the process. He also hit Coleman's upper left arm several times with his sap.

Donnelly came back to the car and saw Coleman trying to get into the front seat. Donnelly also saw that Wilson had his left hand on Coleman's throat and was using his right hand to hit Coleman in the arm with the sap. Donnelly opened the rear door of the car and pulled back on Coleman's handcuffs. As he did so Coleman lunged forward, snapping the chain on Donnelly's fingers.

A DuPage County deputy sheriff eventually arrived with a cage car. Coleman was transferred to that car and taken to the DuPage County jail. During the ride to the jail Coleman was quiet and made no mention about stomach pains or about the need to use the bathroom. At the jail a nurse examined him. She noted a slight swelling on his left arm, but no other injuries or distress.

Donnelly went to Good Samaritan Hospital where he had his left hand and left ankle x-rayed. The doctor who treated Donnelly noted that he had a sprained left ankle, a sprained finger on his left hand, and abrasions on both hands.

On May 9, 1989, a federal grand jury returned a two-count indictment charging Coleman with forcibly assaulting, resisting, opposing, impeding and interfering with United States Postal Inspectors Donnelly and Wilson while they were engaged in the performance of their official duties. *See* 18 U.S.C. § 111.

On August 1, 1989, the case was set for a jury trial. During the trial the district court granted the government's motion to exclude, among other things, evidence of previous harassment and a threat by Headley against Coleman, and evidence of Coleman's history of stomach problems. At the close of all the evidence the jury returned a verdict of guilty on the two counts. Coleman was sentenced to five months in prison, followed by one year of supervised release.

On appeal Coleman challenges two of the district court's evidentiary rulings. We set forth the proper standard for appellate review in *United States v. Glecier*, 923 F.2d 496 (7th Cir.1991). We stated there:

"Appellants who challenge evidentiary rulings of the district court are like rich men who wish to enter the Kingdom; their prospects compare with those of camels who wish to pass through the eye of a needle. In more secular terms, to prevail in this challenge, [the defendant] must establish that [the district court] abused his wide discretion in ... ruling on the admissibility of evidence. Further, because it is a 'comparison of intangibles,' a district court's Rule 403 balancing is afforded a special degree of deference: 'Only in an extreme case are appellate judges competent to second-guess the judgment of the person on the spot, the trial judge.'"

*Id.* at 503 (citations omitted).

■ Initially, Coleman argues that the district court abused its discretion in excluding a threatening statement made to him by Headley in February 1988, that "If you think I have been harassing you up to now, just wait and see what I do." Coleman maintains that this statement, along with a past history of harassment by Headley, was relevant to his claim of self-defense, in that it bore upon the reasonableness of his belief that the inspectors acted in conjunction with Headley and that he had to defend himself against them, and therefore was admissible as evidence in his case-in-chief.

We reject this argument and conclude that the district court properly excluded the evidence as irrelevant. Neither the prior incidents of harassment nor the threatening statement could lead Coleman to reasonably believe that he had to fear for his safety, because there was never any threat of physical violence made to Coleman. Nothing that Coleman proffered to the district court demonstrated that Headley engaged in physical violence against Coleman, that Headley enlisted others to inflict physical violence on Coleman, or that Headley ever threatened to do either of

these things to Coleman. Coleman's proffer consisted solely of evidence of either administrative sanctions or nonviolent behavior by Headley.

Coleman relies on *People v. Robinson*, 163 Ill.App.3d 754, 114 Ill.Dec. 898, 516 N.E.2d 1292 (1987), for the proposition that Headley's threat was admissible to show that he acted in self-defense. *Robinson*, however, is distinguishable, because it involved evidence of threats of violence and not of mere harassment.

■ Coleman next argues that the district court abused its discretion in excluding his history of stomach problems. Coleman maintains that this history also was relevant, in that it bore upon the reasonableness of his actions in the car in moving about to relieve the pressure on his stomach and in loosening his seat belt.

We reject this argument as well. The record reveals that Coleman testified at length concerning the stomach problems that he experienced on the day of his arrest, the conditions that exacerbated his stomach problems, and the fact that he suffered from stomach problems for some time. Additional testimony about stomach problems in prior years would be cumulative, and therefore its exclusion was proper.

■ Even if the exclusion of this evidence was erroneous, such error is reversible only if it affects a party's substantial rights. *See United States v. Arvanitis*, 902 F.2d 489, 501 (7th Cir.1990). We are convinced that the jury was well aware of Coleman's history of stomach problems from his testimony. Coleman failed to show that his inability to present more evidence of that history affected his substantial rights. So any error that resulted was harmless.

Affirmed.

RIPPLE, Circuit Judge, dissenting.

When Phillip Coleman was called to the office of Postal Supervisor Clyde Headley on March 31, 1988, he was entering the office of a postal official who had previously harassed him, who had been disciplined

for that harassment, and who had threatened Mr. Coleman with escalated harassment. Now Mr. Headley informed Mr. Coleman that he was being fired. Two postal inspectors were present. Whether these law enforcement officers simply attempted to calm Mr. Coleman or impermissibly roughed him up is a jury question involving delicate and complex issues of credibility. In determining whether Mr. Coleman acted under a reasonable belief that he was the object of an illegal assault, the jury had a right to know that the man in whose office the activity took place and who had caused the show of force by arranging for the presence of the inspectors had threatened the defendant with escalated harassment. Consequently, in my view, the district court should have admitted the proffered statement of Mr. Headley. Moreover, because the statement was crucial to the self-defense argument of the defendant and required the jury's credibility assessment, I cannot say that it was harmless error.

Evidentiary rulings are reviewed under a highly deferential standard which appellate courts express in a variety of semantical formulas. This deference is justified by the institutional roles that trial courts and appellate courts play in the administration of justice. Nevertheless, we must remember that one function of the appellate court is to take the long, unruffled view of a matter that the trial court necessarily must decide with greater speed. Consequently, no disrespect need be intended or ought to be implied when, occasionally, an appellate court assesses the impact of an evidentiary ruling in a different light than the trial court. While our review is deferential, it is a review nonetheless.

I would reverse the judgment and remand for a new trial.