UNITED STATES of America

v.

David E. HOLCOMB.

Criminal No. 93–13 SSH.

United States District Court, District of Columbia.

Aug. 21, 1996.

Lisa A. Gok, Katherine Winfree, U.S. Attorney's Office, Washington, DC, for plaintiff.

George Jay Mendelson, Rockville, MD, for defendant.

## MEMORANDUM ORDER

STANLEY S. HARRIS, District Judge.

Defendant was indicted and charged with offenses relating to alleged money laundering activities in two separate January 14, 1993, indictments. On March 11, 1993, the government filed superseding indictments.[1] On March 29, 1994, a jury returned verdicts of guilty against defendant on one count of conspiracy and two counts of laundering the proceeds of unlawful activity. On June 21, 1994, the Court sentenced defendant to a term of 46 months' imprisonment on each count (the bottom of the guideline range), to be served concurrently, followed by two years' supervised release with a requirement for 200 hours of community service.

Following his conviction, defendant filed a notice of appeal. On July 26, 1995, defendant moved to dismiss his appeal and, on August 28, 1995, filed a consolidated Motion for a New Trial and to Vacate Sentence. See Fed.R.Crim.P. 33; 18 U.S.C. § 2255.

On November 21, 1995, defendant supplemented his motion with an additional claim of ineffective assistance of counsel. Defendant claimed, *inter alia*, that his trial counsel, George Mendelson, Esq., misinformed defendant about the possible sentence defendant faced if he went to trial instead of accepting the government's plea offer. Defendant's motion states that his counsel told him that "while he could get 4–5 years the Judge could still sentence him to a 12 month term of imprisonment" if he were convicted after trial. Defendant contends that, based on this advice, he rejected the government's plea offer, which had a potential sentencing range of 12 months' imprisonment.[2] Defendant thus seeks, in effect, to have his convictions vacated and gain the benefit of the original plea bargain offer.[3]

By a Memorandum Order dated April 19, 1996, the Court resolved all of defendant's claims except for the claim of ineffective assistance of counsel. The Court held a hearing on June 26, 1996, in order to resolve this final claim. This Memorandum Order sets forth the Court's findings of fact and conclusions of law. Based on the credible evidence presented at the hearing, the Court denies defendant's motion.

### Findings of Fact

Testifying at the hearing were defendant David Holcomb, attorney George Mendelson, who represented defendant through his sentencing, and Assistant United States Attorney William Blier, who was one of two prosecutors in the trial of this case. A central issue is whether defendant's counsel misinformed him regarding the sentencing guidelines.

Beginning in approximately November 1993, defendant and Mendelson began discussing a plea offer that had been extended by the prosecution.[4] Tr. at 18–19. Defendant concedes that his attorney advised him that he could, if convicted, receive a sentence of four or five years. Tr. at 8. However, defendant contends that his counsel created a belief that, with a downward departure, defendant would receive a sentence of 12 months or less. Tr. at 9, 10. Defendant rejected the plea offer and made a counter-offer to the government: he requested that he be permitted to plead guilty to a misdemeanor charge that would carry with it a six-to-12-month sentence; the government rejected this counter-offer. Tr. at 6, 7.

In addition to conversations about the plea offer, defendant and Mendelson discussed the potential sentence defendant faced if he

---

1. The government later dismissed the charges against defendant in Crim. No. 93–15.

2. The exact term of expected incarceration is not made clear in defendant's pleading. Defendant recalled the plea offer as requiring him to admit his guilt to a felony charge in exchange for a sentence of between six and 12 months' incarceration. Tr. at 6, 9. Mendelson recalled that the plea offer carried a 12–month sentence. Tr. at 23. AUSA William Blier recalled that the plea offer carried zero to six months. Tr. at 46.

3. One plea offer was reduced to writing; apparently a second was made orally. Both were rejected by defendant.

4. Defendant and Mendelson had many discussions; defendant was in Mendelson's office "on almost a daily basis" assisting in pretrial preparation. Tr. at 29–30.

were convicted after trial. Tr. at 8, 10, 12. Defendant testified that Mendelson told him that he could receive as little as 12 months' imprisonment, citing by way of explanation that defendant was a first-time offender, that the case involved a government "sting" operation (the sale of automobiles for cash to undercover police officers posing as drug dealers), and that a number of co-defendants who had pleaded guilty would be sentenced by the same judge. Tr. at 8. Defendant also testified that Mendelson told him that he could receive a sentence as long as four to five years, although he testified that Mendelson did not explain how this could occur. Tr. at 8, 10, 12. Defendant further testified that, at the time of trial, he was still unaware of how the Sentencing Guidelines worked and of the existence of the Guidelines Manual. Tr. at 9, 11. However, defendant also testified that he had discussed the Sentencing Guidelines with Kevin Colabucci, a co-defendant.[5] Defendant testified that he discussed with Mendelson "the information I was receiving from Mr. Colabucci[, which] was that the Sentencing Guidelines were set in stone pretty much." Tr. at 53.

Defendant testified that Mendelson did not advise him whether a 12–month sentence or a four-to-five-year sentence was more likely. Tr. at 10. But while defendant knew that a four-to-five-year sentence "could happen," he concluded that the 12–month sentence was more likely because Mendelson gave "more of an explanation" for that result. Tr. at 13. Mendelson testified that he did not specifically advise defendant whether to accept or reject the plea, as he believed that this decision was one for defendant to make. Tr. at 23–24, 39.

Mendelson testified that, in helping defendant to make a decision about whether to accept the plea offer, he had a number of discussions with defendant concerning the outcomes he could expect both from trial and in the event of a plea. Tr. at 18–19, 20, 21, 30. Mendelson testified that, in addressing the possibility of a four-to-five-year sentence of imprisonment, he discussed the Sentencing Guidelines with defendant and how they have an impact upon a court's discretion at sentencing. Tr. at 19–20. Mendelson testified that he also explained that the guidelines permit a court some discretion to depart downward from the applicable sentencing range because of the particular circumstances of the case and of the defendant, and that he indicated to defendant that he thought this case was an appropriate one for a downward departure. Tr. at 21–22.[6] Mendelson further testified that he cautioned defendant that a departure was not something upon which he could rely. Tr. at 21–22. Mendelson testified that he emphasized to defendant that defendant should take this case very seriously.[7] Tr. at 36, 37.

---

5. Kevin Colabucci pleaded guilty in Crim. No. 93–15 on April 15, 1994.

6. Mendelson requested a downward departure at sentencing. Tr. at 22. The Court denied this request. Tr. at 23.

7. On cross-examination, defendant's current counsel asked Mendelson whether he had ever told defendant that he wanted to try this case. Mendelson said that he did tell defendant that this would be an interesting case to try and he would be interested in trying it. Tr. at 31. Presumably, defendant means to suggest that Mendelson inappropriately put his own interests before defendant's welfare. In a July 8, 1996, letter to the Court (subsequent to his testimony), Mendelson wrote:

As I was walking from the Courthouse to my car, I thought more about that comment and the context of it. I was able to recall that comment with more detail and certainty. I also recalled a subsequent comment and the context in which those comments were made.

Shortly before the trial, while the Government's plea offer was still on the table, Mr. Holcomb and I had one of our discussions about his options. He was seeking among other things, my advice as to whether he should accept the plea offer or go to trial. It was in that context that I made the comment to him that for me, "it would be fun to try this case." I specifically recall following that comment immediately with "except for the fact that your life in on the line." (It is possible that I made a similar comment on an earlier occasion.) I also told Mr. Holcomb that a trial would be "an interesting challenge."

We discussed his options further and Mr. Holcomb indicated to me that he would not accept the Government's plea offer. I told him to think about his decision over night and to discuss his decision with his family before we finalized it by formally rejecting the Government's offer.

AUSA Blier testified that in late 1993 or early 1994, in the context of plea discussions, he met with defendant, Mendelson, and another AUSA at the United States Attorney's Office. Tr. at 11, 14, 26, 43. Blier testified that the purpose of this meeting was to discuss with defendant "the strength of the case against him, and ... the potential sentences under the guidelines if he were convicted" (a wholly proper ground rule at that meeting was that defendant was not to speak). Tr. at 43–44. Blier testified that he and the other AUSA had with them the Sentencing Guidelines and explained to defendant and Mendelson what they believed was the applicable sentence under the guidelines.[8] Tr. at 45.

Blier testified that defendant was present during the discussion of the Sentencing Guidelines. Tr. at 45. Mendelson corroborated that defendant's potential sentence under the Sentencing Guidelines was discussed at that meeting, and that defendant was present during that discussion. Tr. at 26–27. Defendant testified that he could not recall that sentencing considerations were discussed while he was present in the room, and that at some point during the meeting, he was excused and Mendelson and the AUSAs continued to talk for ten to 15 minutes outside of his presence. Tr. at 11, 15, 16. Blier testified that he also discussed the potential sentence with defendant on another occasion, by reference to the ages that defendant's children would be at the time of his release. Tr. at 51.

The evidence is overwhelming that defendant was told, repeatedly and by multiple parties, that he faced a potential sentence of four to five years. Defendant concedes that he was told of the possible sentence but contends that he did not understand. The Court is thus confronted with a choice between two concepts: one that would require defense attorneys to make certain their clients understand (what might be called a "rule of perfect understanding"), and one that would require defense attorneys reasonably to inform their clients about their choices. A rule of perfect understanding would be a costly rule which would not square well with reality. Given the vagaries of human understanding, it might sometimes be impossible to make another person understand with perfect clarity; hope springs eternal and can affect how human beings process information. Furthermore, the less intelligent the defendant, the stronger his ineffective assistance of counsel motion later might be. The Court declines to adopt a rule that would require defense counsel to elicit perfect understanding from their clients.

Based on the foregoing, the Court finds that defendant was aware of the existence of the Sentencing Guidelines and of the fact that the guidelines would govern his sentence. Defendant was made aware of the guidelines by Mendelson.[9] Moreover, Mendelson advised defendant on several occasions that he faced a possible sentence of four to five years in the event of a conviction after trial. While Mendelson advised defendant of the possibility of a downward departure, he also advised defendant that he could not rely on that possibility.

The Court finds that defendant, Mendelson, and the two prosecutors met prior to the trial to discuss the strength of the government's case, the plea offer, and the potential sentence defendant faced if convicted after trial. The Court finds that the AUSAs reviewed with defendant the applicable Sentencing Guidelines in order to show how they calculated the possible sentence.[10]

---

**8.** Blier testified that at one point, the government had calculated defendant's exposure under the guidelines to be as much as seven years. Blier recalled that this was the potential sentence that he communicated to defendant at the meeting. Tr. at 46, 47.

**9.** The Court observes that defendant inconsistently testified both that (1) he did not know what the guidelines were, and (2) that he discussed the guidelines with Kevin Colabucci and in turn discussed that conversation with Mendelson.

**10.** In reaching this conclusion, the Court observes that defendant's testimony to the contrary rests on the incredible assumption that the prosecutors would have called a meeting with defendant and his attorney, and insisted upon defendant's silence during their presentation, only to exclude defendant from such a substantive part of the meeting as the guidelines and the possible sentence.

The Court finds incredible defendant's testimony that he rejected a plea offer that included an assured 12–month sentence on the belief that he could potentially be sentenced to 12 months if convicted at trial, provided that he obtained a downward departure. Rather, the Court finds that defendant proceeded to trial for strategic reasons—he believed that the chances that he would prevail at trial were sufficiently good—and not because of any allegedly faulty advice that his attorney rendered. This finding is buttressed by statements made by defendant after his conviction: he told the probation officer who prepared the Presentence Report Investigation that he was "totally shocked and very upset" by the conviction, Tr. at 14, Presentence Investigation Report at 10 ¶ 32; at sentencing, he stated that he "thought that if [he] told the truth, everything would turn out all right." Tr. at 14; Tr. of sentencing, June 21, 1994, at 19.

*Conclusions of Law*

In order to establish a constitutional claim of ineffective assistance of counsel, defendant must prove (1) that his attorney's errors were "so serious that counsel was not functioning as the 'counsel' guaranteed ... by the Sixth Amendment," *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), and (2) prejudice, *i.e.*, error "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687, 693, 104 S.Ct. at 2064, 2067–68.

■ To show deficient performance, defendant must show that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 690, 104 S.Ct. at 2064. In reviewing performance, courts are "highly deferential" and apply a strong presumption that counsel's performance was competent. *Id.* at 689, 104 S.Ct. at 2065; *see also United States v. Wood*, 879 F.2d 927, 933 (D.C.Cir.1989). Only the most egregious errors warrant reversal. *Murray v. Carrier*, 477 U.S. 478, 496, 106 S.Ct. 2639, 2649–50, 91 L.Ed.2d 397 (1986). The Court cannot second-guess judgments of counsel "which, with the benefit of hindsight, might prove not to have best served" defendant. *Strickland,*

466 U.S. at 689, 104 S.Ct. at 2065; *United States v. Loughery*, 908 F.2d 1014, 1018 (D.C.Cir.1990). To show prejudice, defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Id.* at 694, 104 S.Ct. at 2068. "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Id.* at 700, 104 S.Ct. at 2071; *accord Hill v. Lockhart*, 474 U.S. 52, 60, 106 S.Ct. 366, 370–71, 88 L.Ed.2d 203 (1985). Defendant fails to satisfy both prongs of the test.

■ The Court first concludes that Mendelson's performance was not deficient. As the Court observed in its April 19, 1996, Memorandum Order, there is little case law on the consequences of a defendant's rejection of a plea offer in favor of going to trial, with a subsequent attempt to recover the benefit of the unaccepted plea bargain. Most claims of ineffective assistance by counsel of this type result from guilty pleas that leave defendants dissatisfied with their sentences. Two cases, however, are instructive: *United States v. Day*, 969 F.2d 39 (3d Cir. 1992), and *United States v. Busse*, 814 F.Supp. 760 (E.D.Wis.1993). In *Day*, the court found ineffective assistance of counsel where counsel affirmatively misrepresented to a defendant that he faced a maximum sentence of eleven years in prison, but where defendant was sentenced to more than 21 years. *Day*, 969 F.2d at 42, 41. The *Day* court stated that "[k]nowledge of the comparative sentence exposure between standing trial and accepting a plea offer will often be crucial to the decision whether to plead guilty." *Id.* at 43. Applying this reasoning, the *Busse* court found ineffective assistance of counsel where counsel advised a defendant that the worst case scenario was probation, but where defendant was sentenced to a period of five months' imprisonment, to be followed by five months' home detention, plus substantial restitution. *Busse*, 814 F.Supp. at 764, 762. The Court held that "[i]t is counsel's obligation to provide the defendant with this knowledge and failure to do so, at least within the context of this case, amounts to ineffective assistance of counsel." *Id.* at 764.

18

Here, however, counsel properly informed defendant about his potential sentence. Counsel's advice about the possibility of a downward departure does not render his performance deficient. Mendelson incorrectly thought (but did not predict) that defendant was a good candidate for a departure. Even so, a "'mere inaccurate prediction, standing alone, [does] not constitute ineffective assistance.'" *United States v. Arvanitis,* 902 F.2d 489, 494 (7th Cir.1990) (quoting *Iaea v. Sunn,* 800 F.2d 861, 865 (9th Cir.1986)). This is especially true in this case, where counsel advised defendant that he could not rely upon the Court's granting of a departure.

■ Moreover, defendant has not shown that he was prejudiced by counsel's advice. First, even if counsel's advice were deficient, defendant received actual notice of the length of the possible sentence from the prosecutors, who met with defendant and counsel and explained the relative sentencing considerations, including the impact of the Sentencing Guidelines. *See United States v. Horne,* 987 F.2d 833 (D.C.Cir.1993) (defendant not prejudiced by counsel's erroneous advice regarding maximum sentence where court's Rule 11 colloquy provided such information). Second, defendant made a strategic decision to go to trial because he apparently believed that the chances were sufficiently good that he could prevail before a jury.[11] Thus, defendant has not shown that his choice was driven by counsel's advice, even assuming arguendo that somehow the advice was deficient.

Accordingly, it hereby is

ORDERED, that the remaining portion of defendant's motion under 28 U.S.C. § 2255 is denied.

SO ORDERED.

---

11. Shortly before the trial in this case, the undersigned had presided over a five-month, 11–defendant trial with comparable evidence. It resulted in some convictions and some acquittals. The Court will never know how the outcomes in that case affected defendant's decision—which, in retrospect, turned out to be wrong.