**UNITED STATES Of America,**

v.

**Ronald J. BOGART, et al, Defendants.**

**No. C2–01–CR–164.**

United States District Court,
S.D. Ohio,
Eastern Division.

June 1, 2007.

Brenda S. Shoemaker, United States Attorney's Office, Columbus, OH, Mark J. Yost, Criminal Division–Money Laundering Sect, Washington, DC, for Plaintiff.

David Freeman Axelrod, Vorys Sater Seymour and Pease, LLP, Frederick Douglas Benton, Terry Keith Sherman, Columbus, OH, Barry Bohrer, Morvillo Abramowitz, New York, NY, Justin Thornton, Law Offices of Justin Thornton, Washington, DC, Adam Schwartz, Zuckerman Spaeder, LLP, Jack Fernandez, Tampa, FL, Larry Zukerman, Zukerman, Daiker & Lear, Roger L. Kleinman, McDonald Hopkins, S. Michael Lear, Cleveland, OH, for Defendants.

---

1. A more detailed description of the allegations against Defendants appears in the third superceding indictment (Doc. 135).

## RESTITUTION OPINION AND ORDER

MARBLEY, District Judge.

### I. Introduction

⋅This matter comes before the Court by way of a restitution hearing held on April 21, 2006. As detailed herein, this Court finds Defendants jointly and severally liable for restitution in the amount $2,492,424.66.

### II. Background[1]

This case involves a complex conspiracy orchestrated by Defendants over a seven year period. In short, Defendants conspired to aid Richard Schultz ("Schultz") in hiding his assets from his creditors, his ex-wife, and the United States Government ("the Schultz conspiracy").

Beginning in 1994, Defendant Domenic Massari III ("Massari") assisted Schultz in the fabrication of a backdated letter which purported to transfer $5.5M of Schultz's assets to his father. Massari, Schultz, and others used this letter to conceal these assets, in connection with sham litigation in Florida state court, from Schultz's creditors. Massari also participated in additional sham litigation against Thomas Bourke ("Bourke"), a Schultz creditor, which caused Bourke to incur massive expenses and frustrated him in his pursuit to collect a $2M judgment owed by Schultz. As part of the conspiracy, Massari also refused to provide certain documents to Gene Butler ("Butler"), in connection with Schultz's divorce litigation with his ex-wife, Marva Heinmiller ("Heinmiller").

Defendant Martin Elson ("Elson") was an attorney employed by St. Paul Fire and Marine Insurance Company ("St.Paul").[2] A central focus of his job was to pursue Schultz's assets on behalf of St. Paul. In

---

2. St. Paul is now known as St. Paul Travelers Insurance Company.

December 1995, while still employed at St. Paul, Elson began secretly working for Schultz. Elson helped hide Schultz's assets and aided in the sham litigation against Bourke. In November 1995, Elson recommended to St. Paul that it sell a judgment it held against Schultz, then valued at over $2M, to Defendant Frank McPeak ("McPeak") for $450,000.[3] Elson at all times knew that McPeak was working on behalf of Schultz. Elson never disclosed to St. Paul that McPeak functioned as Schultz's shill. Moreover, Elson billed both McPeak's Judgment Acquisition Corporation and St. Paul for this transaction.

Also in December 1995, while still representing St. Paul, Elson, along with Massari, orchestrated the assignment of Schultz's $1.3M IRA to McPeak's Judgment Acquisition Corporation to shield this asset from St. Paul and other creditors. On this same day, St. Paul assigned its interest in the judgment it had against Schultz to McPeak's corporation.

Elson also participated in additional sham litigation against Bourke and others on behalf of Schultz. He arranged a fictional deposition of Schultz in January 1996 in order to impede Schultz's creditors and ex-wife. Elson participated in the assignment of the Veren judgment (another client of his law firm) to McPeak's corporation. He worked with Massari to file frivolous and unjustified lawsuits against Bourke which caused Bourke to incur substantial and extensive litigation costs. As a result of Massari's and Elson's actions, Schultz achieved a main objective: he sub-stituted the McPeak corporation in place of himself as the party in various litigations, reduced the amount of debt he owed, and caused the dismissal of various lawsuits against him.

Defendants Ronald Bogart ("Bogart") and Richard Kennedy ("Kennedy") also played significant roles in the Schultz conspiracy. They assisted Schultz in hiding more than $5M in assets through bogus transactions in 1994 and sheltered his money in various Caribbean bank accounts in 1994 and 1995. Later, Bogart and Kennedy assisted Schultz and Elson in repatriating this money and took over McPeak's role as nominee to hold various judgments against Schultz.

Elson pled guilty to Count 3 of the third superceding indictment, Conspiracy to Obstruct the Administration of Justice, in violation of 18 U.S.C. § 371 and 2. and 18 U.S.C. § 1503 pursuant to a plea arrangement with the Government. Count 3 incorporates many of the allegations above and specifically states that, beginning in May 1998, Elson:

> did unlawfully and knowingly conspire, combine, confederate, and agree with each other, with Richard D. Schultz, Tom Schultz, Ronald Bogart, Richard Kennedy and other known and unknown to the Grand Jury, to corruptly endeavor to obstruct and impede the due administration of justice in an investigation conducted by a federal grand jury in the Southern District of Ohio by violating and attempting to violate 18 U.S.C. § 1503.[4] In violation of Title 18, U.S.Code, Sections 371[5] and 2.

---

3. St. Paul actually received $414,602 in March 1996 which represented this $450,000 minus Elson's legal fees.

4. 18 U.S.C. § 1503 states in relevant part:

> Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court ... shall be punished ...

5. Section 371 states:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such per-

On April 21, 2006, after determining that level 10 was the appropriate level under the Sentencing Guidelines, this Court sentenced Defendant to ten months of imprisonment, consisting of two months incarceration and eight months of home confinement as a special condition of the three-year term of supervised release. The Court then ordered that the restitution order applicable to Defendant Elson would be entered pending the completion of the restitution hearing, and the Defendant was provided his appellate rights.

After the restitution hearing, Defendant's counsel asked whether the Court would recommend community confinement in lieu of imprisonment. The Court then ordered the parties to brief the question of whether community confinement will satisfy the term of imprisonment. The parties thereafter briefed the question of community confinement and, on April 24, 2007, the Court issued the Judgment in a Criminal Case ("JNC") reflecting the sentence that was imposed on April 21, 2006, and ordering restitution in the amount of $2,962,880. On May 24, 2007, the Defendant filed a motion for an extension of time to file an appeal of the JNC, contending he did not of the ten-day requirement to file a notice of appeal (Docs.300–302).

The Court issued the JNC before it assessed the Parties' various arguments and the evidence presented at the restitution hearing which is properly addressed below. Moreover, this Court did not set out a payment schedule or other integral parameters of a restitution order under the MVRA in the JNC. The restitution amount, like the $3.3M restitution ordered against Bogart and Massari was a pro forma amount entered pending modification as a result of the restitution hearing. Given the timing of the JNC vis-a-vis this order, Defendant Elson's opposition to the

amount of restitution imposed in the JNC can properly be construed as a motion for modification of restitution pursuant to 18 U.S.C. § 3664. The Court will treat it as such and orders that Elson pay the restitution ordered herein according to the payment schedule outlined below. Given that this order modifies the amount of restitution ordered in the JNC, Elson's motion for an extension of time to file an appeal of the JNC (Docs.300–302) is hereby **MOOT**.

Massari pled guilty to one count of dual object conspiracy—unlawfully conspiring to commit wire fraud (18 U.S.C. § 1343) and to impede the IRS in the performance of its duties, in violation of 18 U.S.C. § 371—pursuant to a plea agreement with the Government. This Court sentenced him to six months incarceration and three years of supervised release. The Court also ordered him to pay $3.3M in restitution, deferring potential modifications pursuant to 18 U.S.C. § 3664. To date, Massari has made timely restitution payments.

Bogart pled guilty to Counts 1, 2, and 32 of the second superceding indictment against him pursuant to a plea agreement with the Government. Count 1 charged him with conspiring to violate 18 U.S.C. § 1343 (wire fraud) and 18 U.S.C. § 1341 (mail fraud) in violation of 18 U.S.C. § 371. Count 2 charged him with conspiracy to impede and impair the IRS in its duties in violation of 18 U.S.C. § 371. Count 32 charged him with conspiracy to obstruct a federal grand jury by violating 18 U.S.C. § 1503, in violation of 18 U.S.C. § 371. This Court sentenced Bogart to eighteen months incarceration and three years of supervised release. The Court also ordered him to pay $3.3M in restitution, deferring potential modifications pursuant to 18 U.S.C. § 3664.

sons do any act to effect the object of the conspiracy, each shall be fined under this

title or imprisoned not more than five years, or both …

Kennedy pled guilty to one count of multiple object conspiracy—unlawfully conspiring with others to commit wire fraud and tax fraud in violation of 18 U.S.C. § 371—pursuant to a plea agreement with the Government. This Court sentenced him to fifteen months incarceration and two years of supervised release. Defendant Kennedy entered into an agreement with the Government to pay $225,000 within sixty days of sentencing to satisfy his restitution obligation. Kennedy failed to pay this sum within the specified time frame and, as a result, during the restitution hearing on April 21, 2006, this Court vacated the agreement. Contrary to the Government's assertions, this Court did not order that Kennedy pay the full $3.3M in restitution jointly and severally with the other Defendants. The Court will address the amount of restitution Kennedy owes in this order.

McPeak pled guilty to Counts 1 and 2 of the superceding indictment pursuant to a plea agreement with the Government. Count 1 charged him with conspiracy to commit wire fraud in violation of 18 U.S.C. § 371. Count 2 charged him with conspiracy to impede the IRS in the performance of its duties in violation of 18 U.S.C. § 371. This Court sentenced him to five years probation and imposed a $10,000 fine against him. In satisfaction of his restitution obligation, during the hearing on April 21, 2006, this Court approved his agreement with the Government to turn over certain property [6] estimated to be worth between $6M and $10M.

At the conclusion of the April 21, 2006 restitution hearing, this Court ordered the Parties to submit briefs on the amount of restitution each Defendant should be ordered to pay, which victims are entitled to restitution, and the manner in which De-fendants are to pay restitution. Each party has done so. Thus, this matter is ripe for the Court's decision. Pursuant to 18 U.S.C. § 3664, the Court must decide whether to lower the $3.3M in restitution it has already ordered Bogart and Massari to pay and whether to lower the almost $3M it ordered Elson to pay in the JNC. It must also fix the new amount of restitution that Kennedy must pay.

## III. Analysis

### A.) Overview

■ Under the Mandatory Victim Restitution Act (the "MVRA"), 18 U.S.C. § 3663A, this Court *must* order a defendant to pay restitution to a victim of certain offenses, including any offenses under Title 18 of the United States Code. 18 U.S.C. § 3663A(a)(1); *United States v. Johnson*, 378 F.3d 230, 244 (2d Cir.2004) (emphasis added). Defendants do not refute the fact that they pled guilty to Title 18 offenses. A victim under the MVRA is defined as a person or entity "directly or proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2); *United States v. Newsome*, 322 F.3d 328, 338 (4th Cir.2003). An individual defendant convicted of conspiracy must pay restitution resulting from the conduct of the entire conspiracy and not simply reimburse the losses resulting from his individual conduct. *Newsome*, 322 F.3d at 338. The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense,

---

6. Certain judgments against Schultz which the Government estimates to be worth between $6M and $10M. As McPeak turned over these judgments, his obligation is satisfied and the findings in this order do not pertain to him

however, is on the Government. 18 U.S.C. § 3664(e).

■ Restitution orders issued under the MVRA are to be enforced pursuant to the provisions of 18 U.S.C. § 3664. *See* 18 U.S.C. § 3663A(d). Section 3664 does not allow a court to consider a defendant's ability to pay when setting the amount of restitution; rather, the amount must be set at the full amount of the victims' losses. 18 U.S.C. § 3664(f)(1)(A). The court, however, in setting a payment schedule for the restitution should consider: (1) the defendants' financial resources and assets; (2) defendants' projected future cash flow; and (3) defendants' financial obligations. 18 U.S.C. § 3664(f)(2). If the court finds multiple defendants culpable for the "loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant." 18 U.S.C. § 3664(h). The defendant bears the burden of proof of establishing his financial condition. 18 U.S.C. § 3664(e). In addition, "if the court finds that more than 1 victim has sustained a loss requiring restitution by a defendant, the court may provide for a different payment schedule for each victim based on the type and amount of each victim's loss and accounting for the economic circumstances of each victim." 18 U.S.C. § 3664(I). A district court's restitution order is reviewed for abuse of discretion. *United States v. Lively,* 20 F.3d 193, 200 (6th Cir.1994).

### B.) The Government's Position

The Government's contends that it put forth ample evidence at the restitution hearing to prove, by a preponderance of the evidence, that Defendants should be found jointly and severally liable for restitution payments to St. Paul in the amount of $1,748,000, Bourke in the amount of $744,424.66, and Heinmiller in the amount of $128,703.87.

### 1.) St. Paul

■ At the restitution hearing, attorney John Mazza ("Mazza") testified on behalf of St. Paul. Through his testimony and accompanying documents, the Government showed that Defendant Elson, as part of the Schultz conspiracy, convinced St. Paul to sell its judgment against Schultz for approximately 21% of its fair market value. Mazza testified that had St. Paul known that Defendant McPeak was a stand-in for Schultz, it would not have sold McPeak this judgment.

On December 5, 1995, the date when St. Paul sold McPeak the judgment, its face value was $2,162,000. St. Paul received $450,000 from McPeak in exchange for the judgment. Elson charged St. Paul $36,000 in legal fees associated with this transaction. The Government requests that this Court award St. Paul $1,748,000 in restitution—which represents the value of the judgment ($2,162,000) plus the fraudulent legal fees ($36,000) less the value St. Paul received in the transaction ($450,000). St. Paul does not seek interest.

The Government has established with credible evidence that but for the Schultz conspiracy, St. Paul would not have sustained the loss associated with the sale of its judgment against Shultz. It has further established the value of the judgment and Elson's attorneys fees with appropriate documentation. The Court has broad discretion in establishing the value of the harm to victims in restitution cases. *See Lively,* 20 F.3d at 200 ("the court has very broad discretion in setting the terms of the restitution order." (citations omitted)). In its discretion, the Court agrees with the valuation provided by the Government. Arguments can be made that St. Paul could never have recovered the face value

of the judgment, that it would have exercised its business judgment to sell the judgment at an amount lower than face value, or that the legal fees associated from enforcing the judgment would bring down its value. Nonetheless, St. Paul possessed a valid, enforceable, and marketable judgment against Schultz. It would be speculative of this Court to assume that St. Paul would receive less than full-market value on its judgment. Therefore, before evaluating Defendant's response, this Court finds that the Government has met its burden of proving by a preponderance of the evidence that Defendants owe St. Paul $1,748,000 in restitution.

## 2.) Bourke

At the restitution hearing, Bourke testified on his own behalf. Bourke, on behalf of a client whose interest he had partially succeeded, was attempting to collect and enforce a judgment ("the Bryant Judgment") against Schultz in federal court in San Francisco. The Government offered substantial and credible evidence that Defendants, among other things, through a series of frauds, hid Schultz's assets to make him appear indigent to the court. In addition, they filed several sham lawsuits against Bourke and his client in connection with the Bryant Judgment litigation in courts in Ohio, Florida, Illinois, and other states. The Bryant litigation was eventually settled out of Court for $2M; this represented an "overall settlement of everything" including a libel case filed against Bourke personally. (Tr. 67). At the time of settlement, Bourke knew that he was selling the judgment to Schultz's shill.

Bourke asks for restitution of $2M relating to: (1) legal fees and collection costs he expended in defending himself from sham lawsuits filed by Defendants; (2) legal fees and collection costs related to certain sham lawsuits filed in connection to the Bryant litigation; (3) $40K he expend-

ed in helping the IRS with its investigation against Schultz and Defendants; and (4) prejudgment interest. Bourke was trying to "recover essentially the same collection costs from Richard Schultz" in the Bryant litigation before it settled. (Tr. 76).

The Government, through Exhibit 22, asks this Court to enter a restitution order against Defendants on Bourke's behalf in the amount of $744,424, 66. This amount represents the costs and fees resulting from efforts to collect from, or defend himself against, Schultz and Defendants from the initiation of his collection activities to the date of the Bryant settlement and $40K he expended in helping the IRS.

■ The law clearly entitles Bourke to the $40K he expended assisting the Government in its investigation of Defendants. *See, e.g., United States v. Dubose,* 146 F.3d 1141 (9th Cir.1998) *citing* 18 U.S.C. § 3663A(b)(4) (awarding restitution for expenses incurred in helping government investigation); *United States v. Beaird,* 145 Fed.Appx. 853 (5th Cir.2005) (per curiam); *United States v. Phillips,* 477 F.3d 215 (5th Cir.2007).

The Government argues that the MVRA dictates that this Court must award restitution for the attorney's fees that Bourke expended in defending against the fraudulent lawsuits filed by the conspirators. The Government's reliance on *United States v. Cummings,* 281 F.3d 1046, 1052 (9th Cir.2002) to support this proposition is misplaced. The *Cummings* court only held that a victim may recover her attorneys fees in connection with the "investigation and prosecution" of the defendant. The attorneys fees in question in this case relate to judgment collection and defense fees resulting from fraudulent litigation; they do not encompass monies Bourke spent to help the Government. The Government's reliance on *United States v. Richard,* 234 F.3d 763, 770 (1st Cir.2000) is

likewise misplaced. The *Richard* court did not conclusively reach a decision on whether attorneys fees are recoverable under the MVRA because the defendants "did not specifically object to the inclusion of attorney's fees at sentencing." *Id.* at 771. Although the court did not rule on this issue, it did frame the issue for future discussion.

While noting that the attorney's fees are not direct damages and that "a majority of the circuits have held that restitution under section 3663(b)(1) cannot include consequential damages," [7] the prosecution in *Richard* argued that the MVRA authorizes courts to award restitution for attorney's consequential damages if the "victims' legal expenses were losses reasonably foreseeable." *Id.* The First Circuit did imply, in its dicta, that it felt that the Government's argument did not have merit. *Id.* at 771 (Reviewing the district court's order for plain error, the First Circuit stated that "while the majority of our sister circuits have held that, under this language, restitution cannot include consequential damages such as attorneys' fees, the law in this circuit was not 'obvious' when the district court made its decision, and the district court's restitution order was not particularly 'egregious' under the circumstances. We, therefore, affirm the district courts restitution order.").

■ While the Sixth Circuit has not yet specifically addressed the issue, after examining the plain language of the MVRA, this Court agrees with the majority of Circuits that consequential damages cannot be included in a restitution order. The next logical question is whether attorneys' fees constitute consequential or direct damages.

■■ Few Circuits have addressed this issue and it is a novel one in the Sixth Circuit. Consequential damages are "losses that do not flow directly and immediately from an injurious act but that result indirectly from the act." Black's Law Dictionary (8th ed.2004); *Rain & Hail Ins. Service, Inc. v. Federal Crop Ins. Corp.,* 426 F.3d 976, 980–81 (8th Cir.2005). The courts that have addressed whether attorney's fees are direct or consequential damages have held that they can be both, depending on underlying facts of the case. In *United States v. Corey,* 77 Fed.Appx. 7 (1st Cir.2003), the First Circuit held that the MVRA permitted the recovery of attorney's fees if they were the direct consequence of Defendant's criminal scheme. In examining whether the fees were a direct consequence, the court asked whether the fees were a reasonably foreseeable result of the defendant's conduct. In *Corey,* the First Circuit found that the bank's cost of recovering a loan it issued based on fraudulent representations of the defendant, including its attorneys fees, would not have resulted "but for" defendants' underlying criminal conduct. *Id.* Essentially, the attorney's fees became part of the intrinsic value of a fraudulently obtained loan. Thus, the court found that they were direct and not consequential damages. *Id.; see also United States v. Akbani,* 151 F.3d 774 (8th Cir.1998) (holding, in a bank fraud case, that there is "no blanket prohibition in the VWPA against inclusion of attorneys' fees in the calculation of a restitution amount for offenses that do not result in damage to or loss or

---

**7.** *Government of Virgin Islands v. Davis,* 43 F.3d 41, 45 (3rd Cir.1994); *United States v. Patty,* 992 F.2d 1045, 1049 (10th Cir.1993); *United States v. Mullins,* 971 F.2d 1138, 1147 (4th Cir.1992); *United States v. Arvanitis,* 902 F.2d 489, 497 (7th Cir.1990); *United States v.* *Walker,* 896 F.2d 295, 307 n. 26 (8th Cir. 1990); *United States v. Barany,* 884 F.2d 1255, 1260–1261 (9th Cir.1989); *United States v. Mitchell,* 876 F.2d 1178, 1184 (5th Cir.1989).

destruction of property"); *United States v. Patty,* 992 F.2d 1045 (10th Cir.1993).

The *Corey* court did note, however, that attorney's fees relating to a civil suit against the defendant based on the underlying criminal offense should be classified as consequential damages and are not recoverable. *Id.; see also U.S. v. Barany,* 884 F.2d 1255 (9th Cir.1989). In *United States v. Havens,* 424 F.3d 535 (7th Cir. 2005), a defendant stole a victim's identity and used this identity to secure a mortgage. The victim discovered the fraud and sued in state court to recover her losses, treble damages, and attorneys' fees. Under the applicable state statute, the state court entered a judgment in favor of the victim for damages and attorneys' fees. At the same time, the defendant pled guilty to fraud in federal court. The court entered a restitution order mirroring the state court judgment. In *Havens,* the Fifth Circuit held that "a civil judgment award by itself, however, is insufficient to support an order of restitution because some damages and costs recoverable in a civil action, such as treble damages, consequential damages and attorneys' fees spent in pursuing litigation against the wrongdoer, do not qualify as 'losses' under the MVRA." *Id.* at 538.

With this framework in mind, this Court must decide whether the attorneys' fees Bourke incurred were a direct result of Defendants' illicit conduct or merely consequential damages. As noted above, Bourke seeks two categories of damages: first, he seeks to recover the attorneys' fees he expended in defending himself in a personal capacity against certain fraudulent lawsuits brought by Defendants in an effort to shunt his efforts as a Schultz creditor; second, he seeks certain fees in association with his collection efforts in the Bryant litigation.

This Court finds that Bourke's attorneys' fees expended in the course of defending himself in a personal capacity against Defendants' sham lawsuits, the first category above, constitute direct damages recoverable under the MVRA. "But for" the fact that Defendant brought this litigation against Bourke, he would not have incurred these fees. Moreover, attorneys' fees are the most salient, paramount damage that is foreseeable as a result of a fraudulent lawsuit. *See United States v. Blackburn,* 9 F.3d 353 (5th Cir. 1993) (holding that attorneys' fees incurred by victim in defending itself against defendant's lawsuit were direct damages).

The second category of attorneys' fees can be split into two sub-categories. First, the attorneys' fees Bourke and his client incurred as defendants in the various state litigations filed by Defendants in Florida, Ohio, New York, and other states. As above, the Court finds that these are direct damages which occurred as a result of Defendants' fraudulent scheme to hide Schultz's assets from his creditors. Defendants initiated these sham lawsuits in an effort to frustrate Bourke and other creditors, and the attorneys' fees arising therefrom are Bourke's resulting damages.

The second sub-category is the attorneys' fees and costs relating directly to the civil litigation initiated by Bourke and his clients in San Francisco for the purpose of enforcing the Bryant judgment against Schultz. An argument can be made that these fees are direct damages. Defendants hid assets throughout Canada in an effort to conceal them from Bourke. "But for" this illicit conduct and other conduct of the co-conspirators, Bourke's fees in the Bryant litigation would have been much less. These costs, however, were still incurred as part of pursuing a *civil judgment* against Schultz. Defendants may argue, under the logic in *Havens,* that the MVRA does not allow a victim restitution for attorneys' fees sustained as part of an

effort to collect a judgment against a defendant. This is true. In the Bryant litigation, however, Bourke sought a judgment against Schultz, not Defendants. Had Bourke sued Defendants based on the fraudulent scheme at issue in this action, his attorneys fees would not be recoverable. Bourke is not seeking the fees he incurred in pursuing a civil judgment against Defendants or the fees normally associated with collecting a civil judgment. Rather, he requests the extraordinary fees he incurred as a result of Defendants' conduct while he pursued a civil judgment against Schultz. Defendants could reasonably foresee that hiding Schultz's assets could cause his creditors, who were already pursuing a judgment against Schultz, to incur increased legal fees. As a result, this Court finds that these fees are direct damages which are cognizable under the MVRA.

In summary, the Court finds that the $744,424.66 requested by the Government, on behalf of Bourke, is appropriate under the MVRA. The Government has proved that the Schultz conspiracy is directly responsible for this loss and Bourke has provided documents which establish that the damages he sustained amounted to $744,424.66. Therefore, before evaluating Defendants' responses, this court finds that the Government has met its burden of proving by a preponderance of the evidence that Defendants owe Bourke $744,424.66 in restitution.[8]

### 3.) Heinmiller

■ At the restitution hearing, Attorney Gene Butler ("Butler") testified on Heinmiller's behalf. The crux of Heinmiller's restitution claim is that Defendants, as part of the Schultz conspiracy, caused her to sustain extraordinary litigation expenses as part of her divorce proceedings

with Schultz. Butler testified that relevant portions of a divorce case like the one filed by Heinmiller would routinely cost $50,000 to $75,000 to try. Instead, it cost Heinmiller $203,703.87. The Government asks that this Court award Heinmiller $128,703.87, the difference between her actual costs and they high-end of Butler's estimate.

Heinmiller reached a dissolution with Schultz in the later part of 1993. Subsequently, Heinmiller and her attorneys suspected that Schultz lied about his net worth and cash flow in proceedings relating to the dissolution. In October 1994, Heinmiller filed a 60(B) motion, which essentially asked the court to rejoin the marital estate and start the dissolution proceedings anew. Butler testified that he estimated to Heinmiller that it would cost about $35K to bring the 60(B) motion to fruition. For reasons not made sufficiently clear on the record, the trial judge refused to allow discovery in association with the 60(B) motion. As a result, Heinmiller had to use alternative methods of obtaining information which lead to the 60(B) motion to cost approximately $150K. In 1998, the trial judge denied Heinmiller's 60(B) motion because, among other things, she found that it was not brought within a reasonable time period.

Butler cited several ways that he felt the conspiracy caused an increase in the costs of Heinmiller's dissolution litigation. In general, Butler stated that because Defendants hid Schultz's assets, Heinmiller was forced to file the 60(B) motion and then incur substantial costs in tracing these assets. Butler also claims, without offering any support, that the trial judge refused to allow discovery in relation to the 60(B) motion because of the ongoing nature of

---

8. The argument that Bourke waived his right to obtain restitution and/or already recovered these fees as part of the Bryant settlement will be discussed below in the section encompassing Defendant Massari's arguments.

the Schultz conspiracy. The restitution, however, that the Government requests on behalf of Heinmiller relate only to the increased litigation costs incurred by Heinmiller starting in October 1994, after she filed the 60(B) motion.

In relation to these costs, Butler offered only general testimony that the Schultz conspirators "blocked discovery." They refused to return phone calls or respond to subpoenas. Heinmiller, however, fails to establish a direct connection between any specific act of any Defendants and any increases in her litigation costs by a preponderance of the evidence. Butler's billing statements, Exhibits 23 and 24, are routine billing invoices. While they establish that Heinmiller incurred substantial fees in litigating her 60(B) motion, they do not establish that Defendants caused these fees; in fact, the invoices barely reference Defendants. It seems more likely that the trial judge's decision to block traditional discovery was the direct cause of Defendant's increased litigation costs. Because Heinmiller cannot establish that Defendants, as part of the Schultz conspiracy, caused her to sustain a loss in connection with her divorce proceedings, she is not entitled to restitution under the MVRA. Moreover, even if Heinmiller established causation, given the cost intensive nature of heated divorce litigation, especially against a husband who is creative at hiding his assets, the Court finds the figures suggested by Butler too speculative.

In summary, the Court concludes that St. Paul has sustained a $1,748,000 loss redressable under the MVRA, Bourke has sustained a $744,424.66 loss redressable under the MVRA, and Heinmiller as not sustained a *cognizable loss under the MVRA.* As members of a conspiracy, De-fendants shall be jointly and severally liable for restitution to St. Paul and Bourke absent any contravening legal defenses.

## C. Defendants' Rebuttals[9]

### 1.) Bogart's Arguments

■ Defendant Bogart makes three principal arguments. First, he argues that the Court should apportion at least 75% of the restitution to Schultz because Defendant Bogart played only a minor role in the conspiracy. Bogart asks this Court to apportion a lower of amount of restitution to him pursuant to 18 U.S.C. § 3664(h). Bogart's argument is fallacious. Bogart was a prominent participant in the Schultz conspiracy. He played a central role in shielding Schultz's assets by transferring them to offshore locations and by acting as Schultz's nominee as part of McPeak's judgment corporation. Moreover, Bogart did not object the factual findings in the Pre–Sentence Report. Additionally, in his plea agreement, he specifically agreed "to pay restitution to victims of the conspiracy to defraud the victims of Richard Schultz's conspiracy." Because Bogart played a central role in the conspiracy, this Court finds that it is appropriate to hold him jointly and severally liable for the full amount of the losses caused by the conspiracy. *See Newsome* 322 F.3d at 338 (4th Cir.2003) ("under conspiracy law, [a co-conspirator] is liable for the conduct of all co-conspirators that was in furtherance of the conspiracy and reasonably foreseeable to him" *citing Pinkerton v. United States,* 328 U.S. 640, 646–47, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946)).

Second, Bogart argues that certain losses which Bourke claims were incurred before the start of the conspiracy. The

---

9. To the extent that the Court addressed one of Defendants' arguments in the previous section, it will not address them in this section. Also, to the extent that Defendants' make the same argument, or incorporate each others' arguments, the Court only will address each argument once.

indictment indicates that the conspiracy began in earnest in June 1994. All losses to Bourke detailed above occurred after that date.

■ Third, Bogart contends that Bourke is not entitled to receive compensation for lost earnings. He is incorrect. 18 U.S.C. § 3663A(b)(4) specifies that "lost income" can be included in a restitution award. *See also United States v. Havens,* 424 F.3d 535, 538 (7th Cir.2005) (holding that a victim's time is compensable in a restitution order if that time would otherwise have been compensated by salary or other payment).

Bogart also asks this court either to apportion a lower amount of restitution to him or only to order restitution in the amount of $100 per month because his expenses outstrip his income. The Court will address the indigency arguments of all Defendants below in the "payment schedule" section of this opinion.

### 2.) Kennedy's Arguments

■ Defendant Kennedy makes several arguments as to why this Court should limit the restitution order imposed against him to $225,000, the amount he originally agreed to pay. First, he, like all Defendants, argues that he should be responsible only for the losses incurred as a result of his personal conduct rather than the conduct of all the conspirators. Defendant acknowledges that he actively participated in the Schultz conspiracy from near its inception in October 1994 until April 1995. Then, he took a 4–and–a–half year hiatus from his illegal activities until December 1999, when he rejoined the conspiracy. He argues that he should not be responsible for the losses incurred during the 4–and–a–half year period in which he did not actively participate in hiding Schultz's assets and defrauding various persons. As previously discussed, under the MVRA, a co-conspirator is liable for the losses resulting from the entire conspiracy, not just

his individual conduct. *See, e.g., United States v. Newsome,* 322 F.3d 328 (4th Cir. 2003). Moreover, as discussed in detail below, a conspirator is liable for the conduct of his co-conspirators that occurred before he joined the conspiracy. *See, Newsome,* 322 F.3d at 342. Thus, Kennedy's mere participation in 1999 and 2000 would make him liable for losses caused by the conspiracy in prior years. Kennedy further argues that the actions of Elson and other members of the conspiracy were not foreseeable to him. This argument lacks merit. Indeed, it is foreseeable to Kennedy that Elson would lie to St. Paul in an attempt to get St. Paul to sell its judgment against Schultz for a fraction of its value.

■ Second, Kennedy argues that because this Court did not impose a restitution order on Kennedy within 90 days of his sentencing hearing, 18 U.S.C. § 3664(d)(5) dictates that the previous $225,000 restitution order is final and cannot be altered. 18 U.S.C. § 3664(d)(5) states, in relevant part, that "if the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing." The Sixth Circuit in *United States v. Vandeberg,* 201 F.3d 805, 813 (6th Cir.2000) held that the MVRA does not require the Court to hold a restitution hearing within 90 days of sentencing but must resolve "the restitution question-including any objections a defendant may have-within 90 days of the sentencing hearing."

Kennedy's argument is without merit. This Court imposed restitution against Kennedy at the sentencing hearing. Kennedy cannot now use the fact that he did not pay the restitution ordered at the sen-

tencing hearing to prevent the Court from modifying the order. His failure to pay and newfound evidence relating to the victim's losses present changed circumstances which allow the Court to modify the restitution order. *See id.* at 814 ("Section 3664(d)(5) is not a jurisdictional statute. Were we to read it as terminating a court's jurisdiction 90 days after a sentencing hearing, we would be effectively nullifying its provision that a victim may petition the court for an amended restitution order 60 days after the discovery of any additional losses. *See* 18 U.S.C. § 3664(d)(5). The MVRA permits amendments to restitution orders to reflect changed circumstances, and neither confers nor terminates a court's jurisdiction").

▮ Next, Kennedy argues that the restitution ordered against Defendants should be offset by whatever monies the Government has collected from McPeak.[10] The question of whether double recovery is permitted under the MVRA in the context of defendants who have been found jointly and severally liable is a novel question in the Sixth Circuit. Several other Circuits, however, have refused to allow restitution to be recovered in excess of the victim's losses. The Second Circuit in *United States v. Nucci,* 364 F.3d 419 (2d Cir.2004) held, as a matter of first impression, that the MVRA's provision for codefendants' joint and several liability for restitution does not permit victims to recover more than the full amount of their losses. *See also United States v. Dawson,* 250 F.3d 1048, 1050 (7th Cir.2001); *United States v. Stanley,* 309 F.3d 611, 613 (9th Cir.2002) (holding that Section 3664 prevents a victim from recovering more than the amount of his loss). The Second Circuit noted that nothing in the text of the MVRA specifically prevents double-recov-

ery of criminal restitution. . *Nucci,* 364 F.3d at 423. The Court based its decision on the common law understanding of restitution. The common law does not permit double recovery of restitution, even in the context of joint-and-several liability, in part because the purpose of restitution is to make the victims whole. *Id.; see also United States v. McDaniel,* 398 F.3d 540, 555 (6th Cir.2005) (holding that federal court could not order restitution to victims under the MVRA if the victims had already been compensated for their losses under restitution orders stemming from state court judgments).

The Government argues that ruling on the question of whether the victims may recover in excess of their identifiable losses is premature at this time because the Government has not yet collected on the judgments that McPeak surrendered and, as such, the victims have not yet received any compensation for their losses. This Court disagrees; there is no reason to delay the decision. Nor is there a reason to detour from the logic of *Nucci* or *McDaniel.* Thus, this Court holds that St. Paul and Bourke may not recover monies in excess of the losses they sustained at the hands of Defendants. Since the victims have yet to receive any compensation for their losses, however, Defendants must pay the restitution outlined in this order, according to the *exact* schedule outlined in this order, until such time that the Government collects on the McPeak judgments and uses that money to make the victims whole.

Last, Kennedy asks this Court to apportion his restitution obligation in line with his contribution to the conspiracy pursuant to 18 U.S.C. § 3664(h). The decision whether to apportion restitution is a dis-

---

10. Specifically, Defendants argue that all restitution should be satisfied by the $6M plus judgments which McPeak turned over to the Government in satisfaction of the restitution order against him.

cretionary one. *See, e.g., Nucci,* 364 F.3d at 422. As with the other Defendants, this Court finds Kennedy's contribution to the conspiracy to be substantial. He played a critical role in concealing more than $5M on Schultz's assets in offshore accounts. Like Bogart, he also served as a nominee to hold Schultz's judgments. Thus, this Court finds it appropriate to hold him jointly and severally liable with the other Defendants for St. Paul and Bourke's losses.

### 3.) Massari's Arguments

■ Defendant Massari makes one novel argument. Massari asserts that Bourke's claim should be denied because of the January 1998 settlement and civil release executed in connection with the Bryant litigation in federal court in San Francisco. In that settlement, with full knowledge of the Schultz conspiracy, Bourke agreed to settle his claim against Schultz for $2M. At that time, he had a request for $962,000 in attorney's fees pending before the San Francisco court. Massari claims that the $2M settlement that Bourke received encompassed his claim for attorney's fees and thus, if this Court awards him the same fees in restitution, he will be recovering the same losses twice.

The purchase agreement executed in connection with the Bryant settlement acknowledges that Bourke assigned away his rights in the aforementioned attorney's fees to McPeak's corporation. (Massari Ex. H p. 5) The Government, however, contends that this release is irrelevant under the MVRA. The Government urges that the release pertains only to any civil claims he had against the conspirators, but not criminal restitution. Further, the Government claims that even if Bourke did intend to release his rights to criminal restitution in the Bryant settlement, he did not have the legal authority to release Defendants from their legal responsibility to pay criminal restitution under the MVRA.

The law in this area is foggy, fluid, and conflicting. Neither party cites precedent that is directly on point. From the Court's research, there are two strains of thought in this area. The Fifth Circuit has held that the purpose of criminal restitution is to restore the victim losses and to rehabilitate or to punish defendants. *United States v. Sheinbaum,* 136 F.3d 443, 449 (5th Cir.1998) (If [the settlement] is based on the same acts, the object of restitution-to restore the party harmed-would indicate that [the defendant] be credited with the amount of the settlement (citation omitted)). The Fourth Circuit agrees. *See, United States v. Karam,* 201 F.3d 320, 328 (4th Cir.2000) ("Restitution pursuant to the VWPA is designed to serve the rehabilitative and retributive purposes of the criminal law, rather than merely compensate victims with an amount to which they feel entitled"). Along those lines, the Fifth Circuit held that while district courts possess the discretion to impose restitution orders in spite of civil settlements, in order "to avoid double-counting, [they] must reduce the size of its restitution order by any amount received by the victim as part of a civil settlement." *Sheinbaum,* 136 F.3d at 449; *United States v. Harmon,* 156 Fed. Appx. 674, 676 (5th Cir.2005). The Fourth Circuit likewise held that if a victim actually recovered his losses, the district court should set-off the amount recovered against the restitution awarded. *Karam,* 201 F.3d at 329 ("The fact that Karam's victims may have accepted certain promissory notes as full compensation does not necessarily determine whether these victims are entitled to restitution pursuant to the VWPA. Rather, the critical question is whether the victims have been actually compensated for losses caused by a defendant's criminal conduct").

The burden, however, in proving that a victim was compensated for his loss falls squarely on the defendant. *Sheinbaum*, 136 F.3d at 449; 18 U.S.C. § 3664(e) (Supp.1997) ("The burden of demonstrating such other matters as the court deems appropriate shall be upon the party designated by the court as justice requires."); *Karam*, 201 F.3d at 329 n. 11 ("In this case, the district court was fully apprised of, and clearly considered, the existence and terms of the settlement agreement between the parties. Karam simply failed to meet his burden of proving that the victims were fully compensated as a result of the settlement or any voluntarily executed promissory notes"). The court is not to assume that the monetary value of a settlement equaled the monetary value of the loss; if that were the case, "then § 3664 would absolutely bar restitution whenever a civil settlement was reached between the defendant and the victim, rather than providing an offset for the value of the settlement." *Sheinbaum*, 136 F.3d at 450.

The second strain of thought is exemplified in *United States v. Savoie*, 985 F.2d 612 (1st Cir.1993), which held that the purpose of criminal restitution is to instill a penalty upon the defendant and, as such, the district court need not off-set a civil settlement against its restitution order under the VWPA. *Id.* at 619. ("Appellant also contends that the settlement amount should at least have been set off against the district court's restitution figure. The statute itself dispatches this contention. The VWPA contemplates setting off amounts already paid under a restitution order against amounts later recovered in civil proceedings. See 18 U.S.C. § 3663(e)(2). There is no mention of set-offs operating in the opposite direction. What is more, the setoff provision is based upon actual payments rather than promises to pay at some future date(s)").

■ This Court disagrees with the *Savoie* approach. It would be incongruous to hold on one hand that the restitution payments of a co-conspirator must cover the joint-and-several obligations of all the conspirators yet, on the other hand, hold that a victim can receive double compensation through a civil settlement and criminal restitution. The focus of a restitution order should be on making victims whole, not on punishing or deterring defendants. Incarceration and criminal fines are better suited for these purposes. As such, this Court is loathe to allow Bourke to recover his attorneys fees as both part of the Bryant settlement and as restitution in this case.

Nonetheless, the burden is still on Defendants to prove exactly what losses Bourke recouped in the Bryant settlement before this Court off-sets any amount against its restitution order. Defendants have not met this burden. In fact, it seems clear that Bourke's attorneys fees have not been "compensated." As discussed above, it does not matter if Bourke intended to waive his attorney's fees as part of the Bryant settlement; it matters only if the settlement actually compensated him for those loses. The evidence indicates that it did not. The Bryant judgment against Schultz was worth slightly over $2M at the time of settlement. Bourke received $2M in the settlement. Thus, the settlement did not cover his attorney's fees above the value of the judgment. Therefore, this Court will not off-set the Bryant settlement against the $744,424.66 loss in attorneys' fees which Defendant sustained as a result of the Schultz conspiracy.

#### 4.) Elson's Arguments

■ Defendant Elson argues that he should not have to pay restitution for a myriad of reasons. First, he argues that Bourke incurred $55K of his damages, and

Heinmiller incurred all of her damages, prior to Elson joining the Schultz conspiracy. The Fourth Circuit in *United States v. Newsome*, 322 F.3d 328 (4th Cir.2003) squarely addresses Elson's first argument. In *Newsome*, a defendant was convicted of both stealing a tree worth approximately $2,000 and conspiring with others to do so. The prosecution claimed a loss of $248,459.53. The conspiracy in which the defendant participated lasted from December 1998 to July 2000. The district court, however, only found by the preponderance of the evidence that the defendant was involved in this conspiracy for "at least in May and June of 2000." The Government's loss for the months of May and June 2000 totaled only $32,321.52. The district court found that the proper amount of loss to be considered for the purpose of determining the offense level under the Guidelines related to his "relevant conduct" and thus used the $32,321.52 as the loss amount in its Guidelines calculation. In ordering restitution, the district court found that as a member of a conspiracy he was "responsible for the acts of the conspiracy [and] held him liable for restitution in the amount of $248,459.53, the amount of loss that *the conspiracy* caused to the United States" over the entire life on the conspiracy. *Id.* at 338.

Relying on *Hughey v. United States*, 495 U.S. 411, 110 S.Ct. 1979, 109 L.Ed.2d 408 (1990), the Fourth Circuit upheld both of the district courts decisions. In *Hughey,* the Supreme Court held that under the Victim and Witness Protection Act (the "VWPA"), formerly 18 U.S.C. § 3579 [11], the predecessor to the MVRA, a court may order restitution only for the loss caused by the specific conduct underlying "the offense of conviction" and not for all relevant conduct. On the other hand, the Sentencing Guidelines focus on all of the defendant's "relevant conduct." In *Newsome,* the Fourth Circuit held, for the purposes of determining the defendant's offense level under the guidelines, that the defendant's "relevant conduct" occurred only during the two month period in which the Government could prove he was part of the conspiracy. The Fourth Circuit explicitly stated that "a defendant's relevant conduct does not include the conduct of members of a conspiracy prior to the defendant joining the conspiracy, even if the defendant knows of that conduct." *Newsome,* 322 F.3d at 339 (citations omitted).

In addressing restitution under the MVRA, however, the Fourth Circuit held the exact opposite—it considered conduct of all conspirators even before the defendant joined. The Fourth Circuit held that the district court properly focused on the "offense of conviction" when determining the amount of restitution that the defendant must pay. *Id.* at 342. The defendant was convicted of conspiracy; thus, the court held, he is responsible for the loss caused by the entire conspiracy, not just the loss incurred during the two month portion in which he was involved. *Id.* The court focused particularly on the perceived legislative intent to fully compensate crime victims. Thus, the Fourth Circuit upheld the district court's restitution order in the amount of $248,459.53, over $200,000 of which occurred prior to the defendant's involvement in the conspiracy.[12] *Id.*

Finding *Newsome* on point and persuasive, and applying it to the facts of this case, Elson's argument that he should not be responsible for the acts of the other conspirators prior to his entrance to the

11. Now 18 U.S.C. § 3663

12. Actually, the district court speculates that it was likely that the defendant was involved

in the entire conspiracy, but found that the Government could only prove by a preponderance of the evidence that he was involved in the conspiracy for its final two months.

conspiracy in December of 1995, as it pertains to this restitution order, fails. Under *Newsome,* he is responsible for the prior acts of his co-conspirators made in furtherance of the conspiracy which he later joined.

 Elson also argues that none of the loses to Bourke, St, Paul, or Heinmiller relates to his "offense of conviction." Elson was convicted of conspiracy to impede a grand jury investigation. He contends that the losses to the three aforementioned victims occurred as a result of the general Schultz conspiracy, and not the conduct for which he was convicted. He further asserts that the *Hughey* decision mandates that this Court focus only on the losses relating offense of conviction when fashioning a restitution order. The VWPA, however, "was amended by the Crime Control Act of 1990, see Pub.L. No. 101–647, § 2509, 104 Stat. 4789, 4863 (1990)", to expand the definition of "victim" to include "any person harmed by the defendant's criminal conduct in the course of the *scheme, conspiracy, or pattern,*" abrogating the *Hughey* decision in certain conspiracy contexts. *United States v. Ledford,* 127 F.3d 1103, 1997 WL 659673 (6th Cir.1997) [13] The MVRA has adopted virtually the same definition for a victim. [14] Thus, the Court, under the MVRA must order restitution that relates directly to a victim's losses within the course of *the entire scheme* and not simply the loss caused by the specific conduct that is the basis for the offense of conviction. *United States v. Davis,* 170 F.3d 617, 627 (6th Cir.1999); *United States v. Woodruff,* 142 F.3d 438, 1998 WL 96559 (6th Cir.1998);

*see also United States v. Jackson,* 155 F.3d 942, 949 (8th Cir.1998) (emphasis added).

Subsequent to the *Hughey* decision, 18 U.S.C. § 3663 was amended. Currently, both § 3663(a)(2) and § 3663A(a)(2) provide that the district court may order restitution to every victim directly harmed by the defendant's conduct "in the course of the scheme, conspiracy, or pattern of criminal activity" that is an element of the offense of conviction, without regard to whether the particular criminal conduct of the defendant which directly harmed the victim was alleged in a count to which the defendant pled guilty, *or was even charged in the indictment.* In *U.S. v. Manzer,* 69 F.3d 222 (8th Cir.1995) , this court permitted restitution awards encompassing all the acts encompassed in the conspiracy, not just the specific acts alleged in the indictment. *Id.* at 230. "[W]e look to the scope of the indictment in order to determine whether it details a broad scheme encompassing transactions 'beyond those alleged in the counts of conviction.'" *Id.,* quoting *Welsand,* 23 F.3d at 207.

Courts have permitted restitution for conduct related to the scheme that was not charged in the indictment and even conduct that occurred outside the statute of limitations. *United States v. Grice,* 319 F.3d 1174 (9th Cir.2003); *United States v. Dickerson,* 370 F.3d 1330 (11th Cir.2004).

 The Government argues that the offense of Elson's conviction, conspiracy to obstruct a grand jury investigation, was part of the larger Schultz conspiracy or

---

13. This is an unpublished decision.

14. A victim under the MVRA is defined as a person or entity "directly or proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves *as an element* a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 366A(a)(2) (emphasis added).

scheme to hide Schultz's assets from his creditors, ex-wife, and the Government. Therefore, the Government asserts, under the aforementioned precedent, Elson is responsible for paying restitution to all victims harmed as a part of the Schultz conspiracy. The case law is clear: *if the offense of conviction involves "as an element a scheme, conspiracy, or pattern of criminal activity,"* this Court must order restitution to all victims harmed by the conspiracy itself, and not just by the offense of conviction. Before applying this law to the facts of this case, it is instructive to examine under what factual circumstances courts have held a defendant responsible for restitution to victims harmed by conduct other than that of the offense of conviction.

In *Ledford,* 127 F.3d 1103, 1997 WL 659673, a defendant was convicted of six counts of wire fraud and five counts of money laundering, as part of a conspiracy, in connection with the misappropriation funds from the sale of various "trade-in" automobiles he negotiated as part of his job at a car dealership. While the defendant was not convicted for every trade-in he misappropriated, the court granted the dealership restitution for all funds related to the "trade-in scheme" which represented an additional $500,000 above the restitution relating directly to the offense of conviction. In *Davis,* 170 F.3d 617, a defendant was convicted of wire fraud in connection with a fraudulent telemarketing scheme. The court awarded all victims of the telemarketing scheme restitution despite the fact that the defendant was not convicted for specifically defrauding each victim. *See, also, Woodruff,* 142 F.3d 438, 1998 WL 96559 (holding that court could order restitution to insurance company for 73 instances mail fraud despite the fact that defendant was convicted of only 27 counts); *Rand,* 403 F.3d 489 (7th Cir.2005) (extending restitution to all victims of an identity theft scheme and not just those

relating to the counts in the plea agreement); *Jackson,* 155 F.3d 942 (check writing scheme) and *Benjamin,* 125 Fed.Appx. 438 (3d Cir.2005) (mail fraud) also involved courts extending restitution to all victims of a fraudulent scheme when the defendant was convicted of defrauding only a certain few victims as part of that scheme.

Unlike the above "pattern" cases, in *United States v. Cohen,* 459 F.3d 490 (4th Cir.2006), the court found that although the defendant only admitted to certain acts within scope of conspiracy in his plea agreement, because he pled guilty to a count charging an overarching conspiracy encompassing a wide variety of other fraudulent conduct, he was liable for restitution to all victims of the entire conspiracy.

With the exception of *Cohen,* the majority of cases in which the courts have extended restitution to victims harmed by conduct outside that of the offense of conviction have involved multiples instances of the exact same conduct—i.e. multiple counts of wire fraud, identity theft, mail fraud, etc. The case sub judice is quite different. The overarching conspiracy in this case—the scheme to hide Schultz's assets—involved many instances of wire fraud, tax fraud, obstruction of justice, and other illegal acts. It did not involve repeated conduct of one nature as was the conduct in *Ledford, Woodruff, Rand, Jackson,* and *Benjamin.* Therefore, this Court must to examine the statutory language of the MVRA and its legislative intent.

Viewing the language of the MVRA in this context, the Court must first question whether a conviction under 18 U.S.C. § 371 necessarily predicates itself on the existence of a scheme or conspiracy. Second, the Court must examine what constitutes the underlying scheme in question. To sustain a conviction under Section 371, the Government must prove that a defen-

dant conspired to defraud the United States. Thus, the first question is answered in the affirmative. The second question can be viewed in one of two ways. One could argue that the "conspiracy" in Count 3 against Elson was restricted to the conspiracy Elson and the other Defendants participated in to obstruct the grand jury. On the other hand, one could argue that the "conspiracy" element of Section 371, as charged in Count 3 of the third superceding indictment, refers to the entire Schultz conspiracy. If the later argument is correct, then the scheme in Count III would constitute an "overarching conspiracy" and the logic in *Cohen* would apply.

The evidence clearly suggests that the conspiracy underlying Count 3 of the superceding indictment against Elson refers to the entire Schultz conspiracy. The indictment is the starting point for examining what acts the offense of conviction encompasses. *See, United States v. Welsand,* 23 F.3d 205, 207 (8th Cir.1994); *Welsand,* 23 F.3d at 207. (encouraging district courts to look to the scope of the indictment in order to determine whether it details a broad scheme encompassing transactions "beyond those alleged in the counts of conviction").

The indictment makes little mention Defendants actions specifically related to their efforts to obstruct the process of the grand jury. Instead, nearly every factual allegation in the indictment refers to the Schultz conspiracy as a whole and Defendants' attempts to shelter Schultz's assets from his creditors, ex-wife, and the Government. Thus, the Court finds that the conspiracy element of Section 371 as applied in Count 3 of the indictment against Elson consists of the entire Schultz conspiracy.

Being convicted of participating in an overarching conspiracy, Elson is liable for restitution relating to all harms directly or proximately caused by the conspiracy. As this court noted above, the Government established by a preponderance of the evidence that St. Paul and Bourke were harmed as a result of the Schultz conspiracy.

As an aside, this Court notes that there is fundamental disconnect between the MVRA, which allows a Defendant to be liable for restitution for conduct, and even for victims, that is neither charged in the indictment or proven beyond a reasonable doubt at trial, and our traditional presumption of innocence before trial. That being said, the holdings of this Circuit, and the legislative intent of the MVRA indicate that Congress intended to bolster the standing of victims at the expense of conspirators during the restitution phase of a criminal case. The legislative history behind the change in the language of the VWPA, subsequently adopted by the MVRA, which broadened the reach of a court's restitutionary powers to victims and conduct beyond those enumerated in the indictment, clearly indicates that Congress intended to the extent possible, "to make victims whole, to fully compensate victims for their losses, and to restore victims to their original state of well-being." *United States v. Simmonds,* 235 F.3d 826, 830–31 (3d Cir.2000); *see, also Newsome,* 322 F.3d 328 ("In sum, the MVRA requires that a court enter an order of full restitution when the loss is caused by a property offense, and the focus of the court in applying the MVRA must be on the losses to the victim caused by the offense"). This requirement is tempered by the fact that the Court must find that the victims' losses are directly or proximately caused by the scheme and not just tangentially linked to it, before it imposes a restitution order. *See, Dickerson,* 370 F.3d 1330. This Court's concerns are further quelled by the fact that the indictment put Elson on notice that he may be

liable for restitution relating to all his conduct as part of the conspiracy. Thus, for the foregoing reasons, the Court finds Elson's argument—that he cannot be held liable for restitution because there were no victims related directly to his conviction for defrauding the grand jury—meritless.

Elson also makes several arguments as to why St. Paul is not entitled to restitution. First, he argues that the testimony of John Mazza, an attorney and only witness for St. Paul, is inadmissible hearsay. Elson contends that, as an outside lawyer, Mazza's testimony is not based on direct knowledge, but rather on information he was provided by St. Paul's management and internal counsel. Elson's position is meritless. Hearsay evidence is admissible at sentencing hearings. *See* Fed.R.Evid. 1101(d)(3); *United States v. Katzopoulos,* 437 F.3d 569, 575 (6th Cir.2006); *United States v. Silverman,* 976 F.2d 1502, 1510 (6th Cir.1992).

Next, Elson argues that the Government did not present competent or credible evidence that illustrated that Elson fraudulently recommended that St. Paul settle its action against Schultz. As discussed above, the Court specifically found credible evidence that the actions of the Defendants, as part of the Schultz conspiracy, directly caused the losses to St. Paul and Bourke. Specifically, the Government presented reliable evidence that proved, by a preponderance of the evidence, that: (1) Elson failed to disclose to St. Paul all material facts in connection with its decision to sell its judgment to McPeak; (2) Elson did not disclose that McPeak essentially worked for Schultz; (3) Elson worked on behalf of Schultz, a party in direct conflict of interest with St. Paul's, while at the same time purporting to work for St. Paul; and (4) Elson engaged in litigation, along with other Defendants, to harass Schultz's adversaries, including Bourke. The actions of Elson and his co-conspirators lead St. Paul to sell its judgment at a loss. Their fraud negates any potential business reason St. Paul may have had for selling its judgment at this dramatic a discount.

Elson further argues that St. Paul was aware that McPeak was a shill for Schultz, and therefore, in essence, it was selling its judgment against Schultz to Schultz himself for pennies on the dollar. He offers, as definitive evidence of this theory, certain settlement documents. The Court searched these documents in earnest in an effort to discern how they indicate that St. Paul had knowledge that McPeak operated as Schultz's shill. These documents, however, are letters from Defendant Massari to Defendant Elson. These letters between co-conspirators in no way show that St. Paul knew that McPeak was working for Schultz. Defendants offer no evidence that any management personnel at St. Paul ever read these letters. Moreover, it is plausible, if not likely, that as legal counsel and the person in charge of collecting this judgment, Elson was the sole person responsible for the type of mid-level communication contained in these letters.

Elson also argues that Bourke's fees are "not cognizable." First, he argues that Bourke's attorney's fees are consequential and not direct damages. He is incorrect. As noted above, under the applicable precedent, this Court found that Bourke's attorneys' fees were direct damages resulting from Defendants' conduct. Second, without citing any precedent, Elson argues that Bourke did not actual incur any attorney's fees because he represented himself in all of the fraudulent litigation brought against him. This argument is fallacious because it neglects to consider the concept of the time value of money. If Bourke had not occupied with defending against the fraudulent charges of Defendants, he could have been making money by representing

clients in other endeavors. *See United States v. Havens,* 424 F.3d 535, 538 (7th Cir.2005) (holding that a victim's time is compensable in a restitution order if that time would otherwise have been compensated by salary or other payment).

## V. Apportionment and Payment Schedule

As briefly discussed above, each Defendant contends that his participation in the conspiracy is minimal in comparison with the other Defendants and asks this Court to apportion a lesser amount of restitution to him. Each Defendant played a crucial role in the Schultz conspiracy—Defendants hid millions of dollars in Schultz's assets and erected legal barriers to prevent Schultz's creditors from enforcing judgments against him. The Schultz conspiracy as a whole caused losses in the millions of dollars to the victims in this case. Each conspirator joined the conspiracy with full knowledge of its scope and, as a result, there is no reasonable basis for apportionment.

In summary, the Government has shown, by a preponderance of the evidence, that each Defendant, as part of the Schultz conspiracy, caused St. Paul to lose $1,748,000 and Bourke to lose $744,424.66. As an integral part of the conspiracy, each Defendant is liable for the total amount of loss caused by the conspiracy, $2,492,424.66. Thus, this Court holds that Defendants Bogart, Kennedy, Elson, and Massari are jointly and severally liable for $2,492,424.66 in restitution to be paid to St. Paul in the amount of $1,748,000 and Bourke in the amount of $744,424.66.

■ The last issue the Court must resolve is the payment schedule. Each Defendant pleads poverty claiming that he does not have the financial resources to pay any significant amount of restitution. Restitution is mandatory regardless of a Defendants ability to pay. *See, United States v. Perry,* 360 F.3d 519 (6th Cir. 2004); 18 U.S.C. § 3664(f)(1)(A). The Court, however, will take into consideration the financial resources of the Defendants when setting the restitution payment schedule. 18 U.S.C. § 3664(f)(2). Defendant Kennedy has failed to submit a financial statement in support of his claims of financial destitution. Likewise, Defendant Massari has failed to submit a financial statement.[15] The Court, therefore, orders that Defendants Kennedy and Massari pay restitution in the amount of $1,000 per month, a reasonable sum based on their current lifestyles.

Defendants Bogart and Elson submitted financial statements to this Court. After examining the financial statements, this Court orders that they pay $500 per month in restitution.

All Defendants are required to start making restitution payments commencing on July 1, 2007, and the first of each month thereafter until the obligation is satisfied. The Government is to distribute the restitution funds pro rata to St. Paul and Bourke whenever the balance of the restitution fund is greater than $100,000. As discussed above, this restitution order is subject to set-off with respect to any amount the Government collects from the judgments which McPeak turned over in satisfaction of his restitution obligation. It is also subject to set-off with respect to any amounts which the Government collects from other perpetrators involved in the Schultz conspiracy to the extent that

---

15. Massari notes in his brief that he attached his financial statement as Exhibit B under seal. Exhibit B, while entitled "Massari Financial Statement" does not actually contain a financial statement. The clerk of the court attempted to contact Massari to have him resubmit it as an exhibit. As of the date of this opinion, he has not resubmitted his financial statement.

these amounts correspond with the loses of St. Paul and Bourke discussed herein. Additionally, the amount of restitution Massari must pay is to be off-set by the amounts which he has already remitted to the Government.

## VI. Defendant Kennedy's Bond Motion

■■■ Defendant Kennedy also moves this court to return the $100,000 in bond money to Ernest Bodnar ("Bodnar"), Kennedy's father-in-law. (Doc. 241). Bodnar allegedly loaned Kennedy the $100,000 to post as bail. The Government objects, and asks this Court to turn over the $100,000. to the Government in partial satisfaction of the restitution ordered against Kennedy (Doc. 243). The Government concedes that if Bodnar is the owner of this bail money, it should be returned to him. The Government, however, alleges that Defendant has not shown that Mr. Bodnar, and not Defendant, is the true owner of the $100,000.

While Rule 46(g) of the Federal Rules of Criminal Procedure requires the release of bail when the conditions are exonerated, the fundamental issue of ownership must first be determined through a proper evidentiary hearing. *See, e.g., United States v. Arnaiz*, 842 F.2d 217 (9th Cir.1988); *United States v. Ener*, 278 F.Supp.2d 441, 447 (E.D.Pa.2003). If a defendant is the owner of the funds, then, upon motion by the government, the Court may order that the bail money be applied to a restitution order against him. *See* 28 U.S.C. § 2044. If Defendant did not have title to the funds, then they cannot be used to satisfy Defendant's restitution obligations. *See, e.g., United States v. Equere*, 916 F.Supp. 450, 452 (E.D.Pa.1996). The fundamental question then is whether Kennedy or Bodnar is the owner of the funds. Such a determination requires an evidentiary hearing. *See Bridges v. United States*, 588 F.2d 911, 913 (4th Cir.1978).

On April 21, 2006, this Court scheduled an evidentiary hearing in this issue. Bodnar did not attend even though he had notice. He submitted an affidavit testified that he owned the funds loaned to Kennedy through the Thermmagcrete company, in which he has a beneficial interest. The Government contends that Bodnar is not credible, and this is another shenanigan on the part of Kennedy to avoid paying restitution. The Court agrees. Given Kennedy's past fraudulent behavior, it is likely that this is another rouse to prevent Kennedy from satisfying his restitution obligations. Without cross examination, it impossible for this Court to discern the veracity of Bodnar's statements. Given that Bodnar has not established that he is the true owner of the bail money, this Court hereby orders the bond money to be surrendered in satisfaction of Defendant Kennedy's restitution. Moreover, even Bodnar concedes that he *loaned* the money to Kennedy. A loan is a transaction wherein the lender gives up a rights in the funds loaned in exchange for a promise to repay the debt, usually with interest. Thus, Bodnar is, in effect, a note holder against Kennedy and does not have an enforceable right with respect to the bail money. Thus, Kennedy's Motion (Doc. 241) is **DENIED** and the Government Motion (Doc. 243) is **GRANTED.**

## VII. Conclusion

For the reasons stated above, this Court finds Defendants jointly and severally liable for $2,492,424.66 in restitution to be paid to St. Paul in the amount of $1,748,000 and Bourke in the amount of $744,424.66. Payments are to be made in accordance with the above payment schedule and are subject to set-off as discussed above. In addition, this Court orders that Kennedy's bail money shall be surrendered in satisfaction of the restitution ordered against him. He shall be credited

$100,000 against the $2,492,424.66 in restitution ordered above. Last, given that this order modifies the amount of restitution ordered in the JNC against Elson, Elson's motion for an extension of time to file an appeal of the JNC (Docs.300–302) is hereby **MOOT.**

**IT IS SO ORDERED.**